1 | Jeffrey I. Golden, State Bar No. 133040
jgolden@lwgfllp.com
2 | Reem J. Bello, State Bar No. 198840
rbello@lwgfllp.com
3 | **LOBEL WEILAND GOLDEN FRIEDMAN LLP**
650 Town Center Drive, Suite 950
4 | Costa Mesa, CA 92626
Telephone: (714) 966-1000
5 | Facsimile: (714) 966-1002

6 | Attorneys for Your Neighborhood Urgent Care,
LLC, Debtor and Debtor-in-Possession
7 |

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **SANTA ANA DIVISION**

11 |

YOUR NEIGHBORHOOD URGENT
CARE, LLC,

      DEBTOR AND DEBTOR-IN-
POSSESSION,

Lead Case No.: 17-bk-14545-TA

Chapter 11

**MOTION FOR ORDER TO SELL AND ASSIGN INTEREST IN UNEXPIRED LEASES FOR NON-RESIDENTIAL REAL PROPERTY TO HOAG DEBTORS PURSUANT TO 11 U.S.C. § 363(b), OR, IN THE ALTERNATIVE, TO ASSUME AND ASSIGN UNEXPIRED LEASES FOR NON-RESIDENTIAL REAL PROPERTY PURSUANT TO 11 U.S.C. § 365; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ROBERT AMSTER, M.D. IN SUPPORT THEREOF**

[Ex Parte Application for An Order Setting a Hearing and Shortening Time for Notice filed concurrently herewith]

[No hearing date set]

MOTION

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY**

**JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ALL INTERESTED**

**PARTIES AND/OR THEIR COUNSEL OF RECORD:**

Your Neighborhood Urgent, LLC, Debtor and Debtors in possession ("Debtor") in the above-captioned bankruptcy cases (the "Bankruptcy Case"), hereby moves to sell and contemporaneously assign the Debtor's interest in unexpired leases for non-residential real property to the Hoag Debtors (as defined infra) pursuant to 11 U.S.C. § 363(b), or, in the alternative to assume and assign unexpired leases for non-residential real property pursuant to 11 U.S.C. § 365 (the "Motion"). By and through the Motion, the Debtor seeks to sell its interest in certain subleases for non-residential real property by and between the Debtor, as assignee of Newport Healthcare Center, LLC, and the owners of the non-residential real property.

I. **RELATIONSHIP BETWEEN DEBTOR AND HOAG DEBTORS AND LEASES AT ISSUE IN THE MOTION**

Hoag Urgent Care-Anaheim Hills, Inc., Hoag Urgent Care-Huntington Harbour, Inc., and Hoag Urgent Care-Tustin, Inc. (collectively, the "Hoag Debtors"), own and operate five (5) urgent care facilities located in Orange County, California. The Debtor is the former management company for the Hoag Debtors. The Debtor filed the instant petition for relief under chapter 11 of the Bankruptcy Code on November 17, 2017. The Hoag Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on August 2, 2017.

Prior to the commencement of their bankruptcy cases, and thereafter, the Hoag Debtors marketed their businesses and/or assets for sale in an effort to generate the maximum value for the benefit of their creditors. In order to facilitate a sale of the Hoag Debtor's assets ("Sale"), the Hoag Debtors must assume and assign their rights and interests in the Properties (defined *infra*) under the Subleases (defined *infra*) and Subsubleases (defined *infra*). The Hoag Debtors have filed their own motion in their

- 2 -                                                              MOTION

1    bankruptcy cases seeking entry of an order (1) finding that the Hoag Debtors are

2    assignees of Debtor under the terms of the Subleases, (2) finding that the Subleases are

3    divisible and, thus, that the portions thereof relating to the Properties (defined *infra*) is

4    independently assumable under section 365 of the Bankruptcy Code,[1] and (3) finding

5    adequate grounds to permit the Hoag Debtors to assume their respective rights under

6    the Subleases (solely as they pertain to the Properties) ("Hoag Debtors' Motion").  The

7    Hoag Debtors' Motion is presently set for hearing on November 29, 2017 at 10:00 a.m.

8    before this Court.

9         Prior to the commencement of this Bankruptcy Case, the Debtor entered into

10    subleases ("Subleases") with Newport Healthcare Center, LLC ("Newport") which holds

11    leases on various pieces of non-residential real property ("Master Leases") with the

12    owners of the non-residential real property ("Landlords").  Debtor is the management

13    company of the Hoag Debtors and only holds bare legal title in the Subleases.  The

14    Hoag Debtors hold the beneficial interest in the Subleases.  The Debtor does not have

15    the funds to cure the amounts outstanding on the Subleases and have never had the

16    funds to pay the amounts due on the Subleases.  The Hoag Debtors have been making

17    the payments due under the Subleases.  The Hoag Debtors do not have the funds

18    necessary to cure any amounts outstanding on the Subleases.  Any cure amounts

19    outstanding under the Subleases will be paid by the proposed purchasers through the

20    close of escrow on the Sale.

21         As such, the Debtor seeks to sell and contemporaneously assign its bare legal

22    title interest in the Subleases to the Hoag Debtors in order to facilitate the Sale.  If the

23    Court requires that the Debtor assume its bare legal title interest in the Subleases and

24    assign it to the Hoag Debtors, then the Debtor seeks this alternative relief pursuant to

25    Section 365 of the Bankruptcy Code.  Any cure required to be paid for the assumption

26

27

28    _____
[1] "Bankruptcy Code" refers to title 11 of the United States Code (11 U.S.C. §§ 101, *et seq*.). Unless otherwise noted, any reference to "section ___" refers to the specified section of the Bankruptcy Code.

MOTION

1  and assignment of the Subleases will be paid by the purchasers through the close of

2  escrow on the Sale.

3

4  **II.    JURISDICTION AND VENUE**

5        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

6  1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  The Debtor consents to

7  the entry of a final order by the Court in connection with this Motion to the extent it is

8  later determined that the Court, absent consent of the parties, cannot enter final orders

9  or judgments consistent with Article III of the United States Constitution.  Venue of the

10  Bankruptcy Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and

11  1409.

12

13  **III.    STATEMENT OF FACTS**

14        The Hoag Debtors operate three urgent care facilities (the "Hoag Clinics"), which

15  are located at 5630 Santa Ana Canyon Road, Anaheim, California (the "Anaheim

16  Property"), 5355 Warner Avenue, Suite 102, Huntington Beach, California (the

17  "Huntington Property"), and 2560 Bryan Avenue, Tustin, California (the "Tustin Property"

18  and, together with the Anaheim Property and Huntington Property, the "Properties").

19        In the process of establishing the Hoag Clinics, the Hoag Debtors and Debtor, the

20  former management company for the Hoag Debtors,[2] entered into a series of

21  agreements with Newport.  The agreements include a structured leasing of the property

22  by which Newport leased the Properties from the Landlords and, shortly thereafter,

23  subleased the Properties to Debtor.  True and correct copies of the leases between

24  Newport and the Landlords (the "Master Leases") are attached to the Declaration of

25  Robert Amster (the "Amster Declaration") as Exhibits A-C.  True and correct copies of

26  the Subleases, as may have been modified and/or amended from time to time, between

27  Newport and Debtor and the Hoag Debtors are attached to the Amster Declaration as

28

---

[2] The Hoag Debtors are presently managed by Radiant Physician Group ("RPG").

MOTION

1  Exhibits D-F.  In general, the Subleases are comprised of three distinct agreements—

2  namely, (a) a lease of the Properties to Debtor for the term of the Master Leases; (b) a

3  financing agreement for the acquisition of certain medical and diagnostic equipment

4  (collectively, the "Equipment"); and (c) a license for the use of the trademark or trade

5  name "Hoag Urgent Care" (the "Trademark" and, together with the Properties and the

6  Equipment, the "Assets").  *See, generally,* Exhibits D-F.  The salient terms of the Master

7  Leases are incorporated into the Subleases—thereby binding Debtor to the terms of the

8  Master Leases.

9      Simultaneously with the execution of the Subleases, Debtor entered into "sub-

10  subleases" with the Hoag Debtors (collectively, the "Sub-subleases").  A true and correct

11  copy of the sub-sublease for the Anaheim Property is attached to the Amster Declaration

12  as Exhibit G.  It was the intention of Debtor and the Hoag Debtors that the Sub-

13  subleases effectuate an assignment of all rights of Debtor under the Subleases to the

14  Hoag Debtors.  Under the Sub-subleases, Debtor granted the Hoag Debtors the

15  exclusive right to utilize the entirety of the Properties for the duration of the Subleases.

16  *See, generally,* Exhibit 3.  Debtor also granted the Hoag Debtors its rights with respect to

17  the Equipment and Trademark under the Subleases.  *Ibid.*  Newport consented to Debtor

18  "sub-subleasing" all rights conferred under the Subleases to the Hoag Debtors.  *See*

19  Exhibit D at p. 12, Exhibit E at pp. 11-12 and Exhibit F at p. 12.

20      Thereafter, the Hoag Debtors utilized the Assets in the operation of the Hoag

21  Clinics in accordance with the terms of the Subleases.  Prior to the appointment of the

22  receiver (as discussed *infra*), the Hoag Debtors (not Debtor) made nearly all of the

23  payments under the Subleases directly to Newport and, with rare exception, satisfied the

24  obligations of Debtor due under the Subleases.

25

26

27

28

MOTION

IV.    **EVENTS PRECIPITATING BANKRUPTCY**

A.    **Opus Action and Appointment of Receiver**

In early 2017, Opus Bank ("Opus") filed two actions against the Hoag Debtors as well as Debtor and Robert C. Amster, M.D. ("Dr. Amster"), the president of Debtor and the Hoag Debtors, in the California Superior Court (the "State Court")—namely, *Opus Bank v. Hoag Urgent Care-Tustin, Inc., et al.*, case no. 30-2017-00911945-CU-BC-CJC (the "Hoag Action"), and *Opus Bank v. Laguna-Dana Urgent Care, Inc., et al.*, case no. 30-2017-00912132-CU-BC-CJC (the "Laguna Action" and, together with the Hoag Action, the "State Court Actions").  Therein, Opus avers that the Hoag Debtors, Debtor, and Dr. Amster (collectively, the "Receivership Parties") violated the terms of certain loan agreements with Opus (the "Opus Loans").[3]

In an effort to appease Opus, permit the amicable discussions between the Debtor, Hoag Debtors and Opus to continue, and afford the Hoag Debtors additional time to explore options for selling the businesses or refinancing the Opus Loans, the Debtor and Hoag Debtors agreed to the appointment of a receiver.  Accordingly, on or about May 25, 2017, the Receivership Parties, on the one hand, and Opus, on the other hand, entered into two stipulations to appoint David Stapleton (the "Receiver") as a receiver over the Hoag Debtors and Debtor, which stipulations were filed in the State Court Actions.  On or about May 25, 2017, the State Court entered orders approving the stipulations and appointing the Receiver as receiver for the Hoag Debtors and Debtor (together, the "Receivership Orders").

Following his appointment, the Receiver failed to pay certain amounts owing under the Subleases to Newport and, thereby, committed a monetary default under the Subleases.  In an apparent effort to resolve the default, the Receiver negotiated a purported "settlement agreement" with Opus, Newport, and Hoag Memorial Hospital Presbyterian ("Hoag"), the parent company of Newport (the "Opus Agreement").

---

[3] The State Court Actions were stayed with respect to the Debtors due to the commencement of the Bankruptcy Cases.  On or about September 26, 2017, the Debtors removed the State Court Actions to this Court.

MOTION

1    Pursuant to the Opus Agreement, the Receiver agreed to relinquish any and all interests

2    the Hoag Debtors held in the Hoag Clinics and transfer the same to Newport.  The

3    Receiver also agreed to collect any and all remaining accounts receivables for the

4    benefit of Opus in partial satisfaction of the purported liability under the Opus Loan.

5    Thereafter, the Receiver sought state court approval of the Opus Agreement on an *ex*

6    *parte* basis.  If approved and consummated, the transaction would have left the Hoag

7    Debtors without any assets to satisfy the obligations owing to its remaining creditors.

8         In order to prevent such an inequitable result, the Hoag Debtors filed voluntary

9    petitions for relief under chapter 11 of the Bankruptcy Code on or about August 2, 2017.

10    **B.**    **Post-Petition Use of Properties and Proposed Going-Concern Sale by**

11          **Hoag Debtors**

12         Following the commencement of their bankruptcy cases, the Hoag Debtors

13    continued to utilize the Properties to operate the Hoag Clinics while devising the most

14    beneficial exit strategy, including, without limitation, a sale of the Hoag Debtors as a

15    going concern or a sale of the Assets.  In association therewith, the Hoag Debtors have

16    continued to remit payments to Newport in accordance with the terms of the Subleases

17    for the use of the Properties.  At present, the Hoag Debtors are current on all post-

18    petition payments due under the Subleases for the use and occupation of the

19    Properties.[4]

20         Following the commencement of the Bankruptcy Cases, the Hoag Debtors

21    entered into an asset sale agreement with a proposed purchaser ("Sale").  On or about

22    October 19, 2017, the Hoag Debtors filed the *Motion to Approve Stalking Horse Bidder*

23    *and Related Bid Protections and to Establish Procedures for the Sale of Estate Assets*

24    (the "Bidding Procedure Motion")—thereby seeking approval of certain buyer protections

25    to facilitate the sale of the Debtors and/or their assets.  On or about October 25, 2017,

26    the Court approved the Bidding Procedure Motion.

27

28

---

[4] The Hoag Debtors are not current on payments related to the acquisition of the Equipment; however, as the Subleases are divisible and, thus, each constituent part independently assumable, the Hoag Debtors need not cure any arrears owing in relation to the Equipment to assume the Subleases as they pertain to the Properties.

MOTION

1    As part of the proposed Sale, the Hoag Debtors desire to sell and purchaser

2   seeks to acquire the Subleases and operations thereunder.   As such, the Hoag Debtors

3   intend to assume the Subleases and assign them to the proposed

4   purchaser.   Therefore, in order for this assumption by Hoag Debtors to take effect, the

5   Debtor seeks to sell and contemporaneously assign its bare legal interest in the

6   Subleases to the Hoag Debtors.  In the alternative, the Debtor seeks to assume the

7   Subleases and assign the Subleases to the Hoag Debtors.

8

9   **V.    HOAG DEBTORS HOLD THE BENEFICIAL INTEREST IN THE SUBLEASES**

10    In order to facilitate the Sale, the Hoag Debtors must first assume their rights and

11   interests in the Properties (defined *infra*) as assigned to them by Debtor under the

12   Subleases (defined *infra*), and pursuant to the Subsubleases (defined *infra*).

13   **A.    The Subsubleases Effectuated an Assignment of the Subleases from**

14   **Debtor to the Hoag Debtors**

15    A "sublease" is not always a sublease; rather, a "sublease" may operate as an

16   assignment of the sublessor's interest under the lease agreement to the sublessee—

17   thereby, establishing privity between the lessor and the sublessee.  "The transfer of the

18   whole of a lessee's interest in a lease is an assignment; transfer of a portion of the

19   lessee's interest is a sublease."  *See Reed v. South Shore Foods, Inc.*, 229 Cal.App.2d

20   705, 710 (1964).  In other words, "'[a] transfer or conveyance by a lessee of his full term,

21   or the remainder thereof, which does not reserve to the lessee a reversionary interest in

22   the leasehold estate, has the legal effect of an assignment of the lease and is not a

23   sublease.'"  *In re Sunshine Precious Metals, Inc.*, 152 B.R. 978, 980 (Bankr. D. Idaho

24   1993), *quoting Groth v. Continental Oil Co.*, 84 Idaho 409, 413, 373 P.2d 548, 549

25   (1962).

26      It is elementary that a sublease, in order to operate as an assignment,
27   must transfer to the sublessee the entire term of the original lesse [*sic*] in
     the whole or some part of the demised premises; and, of course, the
     assignment of the term, in order to terminate the privity of estate between
28   the assignor and the original lessor, must transfer his term in the entire

MOTION

premises. … The term to be transferred to his assignee by such tenant must be for a period of time at least equal to the remainder of the term of the original lease.  It must cover all of the premises demised by the original lease, and it must include all of the estate and interest in said premises possessed by the lessee under the original lease.

*Barkhaus v. Producers' Fruit Co.*, 192 Cal. 200, 205-206 (1923).

Here, the terms of the Sub-subleases effectuated an assignment of Debtor's interests under the Subleases.  Therefore, the Hoag Debtors are the holders of the beneficial interest in the Subleases and in fact the assignees under the Subleases.  Moreover, this assignment to the Hoag Debtors established privity between the Hoag Debtors and Newport—thereby rendering the Subleases property of the bankruptcy estates[5] of the Hoag Debtors and not the Debtor and subject to the rights of the Hoag Debtors as debtors in possession, including, without limitation, the protections afforded them by the automatic stay.[6]  The first consideration pertains to the term of the Subleases and Sub-subleases.  The terms of the Subleases are coextensive with the term of the Master Lease, pursuant to which Newport obtained an interest in the Properties.  *See* Exhibit D at p.2, Exhibit E at p.1, and Exhibit F at p.1.  The Sub-subleases have a term coextensive with the term of the Master Lease and Sublease.  *See* Exhibit G at p.2.

The Subleases and the Sub-subleases also pertain to the entirety of the same property.  More precisely, the Subleases pertained to the following properties: (a) office

---

[5] Property of the estate includes "all legal or equitable interests of the Debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *U.S.A. v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05 (1983) (observing in a Chapter 11 case that "Congress intended a broad range of property to be included in the estate" because "reorganization ... would have small chance of success ... if property essential to running the business were excluded from the estate"); *In re Coomer*, 375 B.R. 800, 804 (Bankr. N.D. Ohio 2007) (The definition of property of the estate is "intentionally broad" and includes "every conceivable interest that the Debtor may have in property."), *citing McGahren v. First Citizens Bank & Trust (In re Weiss)*, 111 F.3d 1159, 1166 (4th Cir.1997) (noting broad definition of property). Property of the estate also includes interests which are novel or contingent or those whose enjoyment may be postponed. *Segal v. Rochelle*, 382 U.S. 375, 379 (1966). All "conceivable" interests of a Debtor, even those that are "future, nonpossessory, contingent, speculative, and derivative," are "within the reach of § 541." *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir.1993), *abrogated on other grounds by, Law v. Seigel*, 134 S.Ct. 1188, 1197 (2014); *In re Herman*, 495 B.R. 555, 584 (Bankr. S.D. Fla. 2013) (observing that the "legislative history of § 541(a) reveals that the section's purpose is to include in the estate all kinds of property whether tangible or intangible, including "anything of value that the Debtors have."), *citing* H.R. Rep. No. 95–595, at 176 (1977).

[6] In the event the Court determines that the Sub-subleases do not constitute an assignment of the Subleases, DEBTOR intends to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, thereafter, move on an emergency basis to assume the Subleases.

MOTION

1  space located at 5630 Santa Ana Canyon Road, Anaheim, California; (b) office space

2  located at 5355 Warner Avenue, Suite 102, Huntington Beach, California; and (c) office

3  space located at 2560 Bryan Avenue, Tustin, California.  *See* Exhibit D at p.2, Exhibit E

4  at p.1 and Exhibit F at p.1.  The Sub-subleases pertain to the same properties in their

5  entirety.  *See* Exhibit G at p.1.  The coextensive nature of the term and property subject

6  to the Subleases and Sub-subleases demonstrates that the Sub-subleases effectuated

7  an assignment of Debtor's interests under the Subleases—an assignment ostensibly

8  consented to by Newport by virtue of their acknowledgement of and consent to the Sub-

9  subleases to the Hoag Debtors.  *See* Exhibit D at p. 12, Exhibit E at pp. 11-12 and

10  Exhibit F at p. 12.  This conclusion is further supported by the fact that Debtor did not

11  retain any unconditional revisionary interest under the Sub-subleases.  To the contrary,

12  Debtor relinquished any and all rights to use the subject Properties (and/or the Assets) in

13  favor of the Hoag Debtors.[7]

14        In light of these incontrovertible facts, Newport, an effort to defeat the proper

15  characterization of the Sub-subleases as assignments of the Subleases, contends that

16  (1) the Subleases and Sub-subleases are not co-extensive and (2) Debtor retains a

17  conditional reversionary interest and, thus, the Sub-subleases cannot constitute

18  assignments.  With respect to the former argument, Newport contends that section 5.4 of

19  the Sub-subleases expressly excludes certain provisions of the Subleases and, thus,

20  cannot constitute an assignment of the Subleases.  *Id.*  The contention is patently false.

21  Section 5.4 of the sub-sublease for the Anaheim Property provides:

22
23      5.4  **Excluded Provisions of the *Master Lease*.**  Notwithstanding
Sections 5.1 through 5.3 above, the following provisions of the ***Master
Lease*** are excluded from this Sublease: 1.1(e), 1.1(f), 1.1(g), 1.1(h), 1.1(k),
24  1.1(o), 1.2(f), 3.1, 3.2, 4.1, [and] Exhibit "E".

25
_____
26  [7] While not a consideration ordinarily weighed by courts, the course of dealing of Newport and the Hoag
Debtors further supports the conclusion that the Sub-subleases effectuated an assignment and, thereby
27  excluded Debtor from the contractual relationship.  This is most evident from the fact that the Hoag
Debtors remitted payments directly to Newport under the Subleases—as opposed to paying Debtor, which
28  in turn paid Newport.  Such a relationship demonstrates that Newport treated the Hoag Debtors as the true
lessees under the Subleases.

MOTION

1    *See* Exhibit D at p.4 (emphasis added).[8]  The cited exclusions are exclusions of terms of

2    the Master Lease, not the Subleases, and, thus, do not establish any variance between

3    the scope of the Subleases and Sub-subleases (as Newport would have the Court

4    believe).  In fact, the Subleases contain identical provisions (*see* section 5.4)—further

5    demonstrating that the Sub-subleases were coextensive with the Subleases and, thus,

6    effectuated an assignment of the Subleases from Debtor to the Hoag Debtors.  *See*

7    Exhibit D at p.4, Exhibit E at p.5 and Exhibit F at p.5

8        The latter argument is equally unavailing.  Newport contends that Debtor retained

9    a reversionary interest in the Sublease due to (1) the right to enter and inspect the

10    Properties and (2) the right to terminate the Sub-subleases in the event of default.

11    Newport, however, provides no support for the contention that the right to enter and

12    inspect the Properties in any way affects the characterization of the Sub-sublease as an

13    assignment.  Indeed, the only case law cited by Newport pertains to conditional

14    reversionary interests.

15        Newport also fails to provide any basis to characterize the right to terminate the

16    Sub-sublease upon default as a conditional reversionary interest.  While a conditional or

17    contingent reversionary interest may indicate that a sublease does not qualify as an

18    assignment, the existence of a revisionary interest is merely one factor considered by

19    the courts in evaluating the proper characterization of a sublease.  *See supra*.

20    Furthermore, courts relying on a conditional reversionary interest to defeat the

21    characterization of a sublease as an assignment do so only if specific rights survive—

22    namely, the right to re-enter or take possession of the property, not merely terminate the

23    sublease.  *See Hartman Ranch Co. v. Associated Oil Co.*, 10 Cal.2d 232, 243 (1937)

24    (right to re-entry upon breach constitutes a "contingent reversionary interest"); *see also*

25    *Garner v. Knudsen*, 129 Cal.App.2d 747,756 (1945) (same); *see also In re Vista Medical*

26

27

---

28    [8] Newport fails to cite any similar or analogous provisions in the other Sub-subleases.  Accordingly, to the
extent deemed relevant, this argument only affects the Anaheim Sublease.

MOTION

1  *Investors, Ltd.*, 98 B.R. 29, 33 (Bankr. S.D. Cal. 1989) (right to enter and take

2  possession).

3      Here, the Sub-subleases do not grant Debtor the right to re-enter or take

4  possession of the Properties; rather, section 23.3 of the Sub-subleases merely grants

5  Debtor the right to terminate the Sub-sublease as a remedy for default—not a

6  contractual right available to Debtor in the event the respective clinics perform under the

7  agreements.  *See* Exhibit G at p.13.  Indeed, Newport fails to cite, and the Hoag Debtors

8  were unable to locate, a decision holding that the right to terminate the sublease upon

9  default constitutes a "contingent reversionary interest" and, more importantly, a sufficient

10 reversionary interest to warrant a *per se* finding that a sublease cannot constitutes an

11 assignment.

12     In sum, it is beyond reasonable dispute that the Sub-subleases effectuated an

13 assignment of Debtor's rights and obligations under the Subleases to the Hoag Debtors.

14 As such, privity exists between the Hoag Debtors and Newport and, more importantly,

15 the Subleases constitute assets of the bankruptcy estates of the Hoag Debtors subject

16 to the rights of the Hoag Debtors as debtors in possession.

17     **B.    The Debtor As Holder of Bare Legal Title May Sell and**

18         **Contemporaneously Assign Its Interest in the Subleases to the Hoag**

19         **Debtors**

20     Pursuant to 11 U.S.C. § 363(b), a debtor in possession may, with court approval,

21 sell property of the estate outside the ordinary course of business.  A proposed sale of

22 estate property will be approved if it is in the best interests of the estate, based on the

23 facts and history of the case.  *See In re America West Airlines*, 166 B.R. 908, 912

24 (Bankr. D. Ariz. 1994) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983)).  A

25 court has broad discretion to authorize a sale under 11 U.S.C. § 363(b).  *See In re*

26 *Walter*, 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988); *see also In re WPRV-TV*, 983 F.2d 336,

27 340 (1st Cir. 1993); *New Haven Radio, Inc. v. Meister (In re Martin-Trigona)*, 760 F.2d

28 1334, 1346 (2nd Cir. 1985); *Lionel Corp.*, 722 F.2d at 1069; *Stephens Indus., Inc. v.*

- 12 -

MOTION

1 | *McClung*, 789 F.2d 386, 390-91 (6th Cir. 1986).  Generally, courts will find that a

2 | proposed sale is in the best interests of the estate where the trustee has a valid

3 | "business justification" for the proposed sale.  *See e.g.*, *Stephens Indus., Inc.*, 789 F.2d

4 | at 390; *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984); *see also*

5 | *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653 (B.A.P. 9th Cir. 1996); *In re Wilde*

6 | *Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991); *In re Ernst Home Center,*

7 | *Inc.*, 209 B.R. 974 (Bankr. W.D. Wash. 1997).  A bankruptcy court's power to authorize a

8 | sale under § 363(b) is reviewed for abuse of discretion.  *See Walter*, 83 B.R. at 19.

9 | Debtor seeks to sell and contemporaneously assign its interest in the Subleases

10 | to the Hoag Debtors subject to all claims and encumbrances, as is, where is, with no

11 | representations or warranties pursuant to Section 363(b) of the Bankruptcy Code.  As

12 | set forth in detail above, Debtor asserts it holds only bare legal title to the Subleases and

13 | that the Hoag Debtors hold the beneficial interest in the Subleases and, as a result,

14 | Debtor seeks to assign and sell its bare legal interest in the Subleases to the Hoag

15 | Debtors.  The proposed purchaser of the Sale from the Hoag Debtors will cure any

16 | amounts due under the Subleases through the close of escrow on the Sale.

17 |

18 | **VI.   THE SUBLEASES ARE DIVISIBLE AND, AS SUCH, THE HOAG DEBTORS**

19 | **MAY ASSUME THE PORTION OF THE SUBLEASES PERTAINING TO THE**

20 | **PROPERTIES INDEPENDENTLY OF THE OTHER CONSTITUENT PARTS OF**

21 | **THE SUBLEASES**

22 | **A.   The Subleases are Divisible**

23 | Under section 365, "[i]t is well established that as a general proposition an

24 | executory contract must be assumed or rejected in its entirety."  *Stewart Title Guaranty*

25 | *Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir.1996) (citation omitted).

26 | This "often-repeated statement ... means only that the Debtor cannot choose to accept

27 | the benefits of the contract and reject its burdens to the detriment of the other party to

28 | the agreement."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th

- 13 -

MOTION

1  Cir.1985).  "However, '[i]f a single contract contains separate, severable agreements the

2  Debtor may reject one agreement and not another.'"  *In re Mirant Corp.*, 197 F. App'x

3  285, 289 (5th Cir. 2006), *quoting Stewart Title Guaranty Co.,* 83 F.3d at 741; *see also*

4  *N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 532 (1984); *In re Plitt Amusement Co. of*

5  *Washington, Inc.,* 233 B.R. 837, 840 (Bankr.C.D.Cal.1999); *In re Stanton,* 248 B.R. 823,

6  830 (9th Cir. BAP 2000) (if the agreement can be disaggregated then each must be

7  considered separately for purposes of section 365), *citing In re Pacific Express, Inc.,* 780

8  F.2d 1482, 1486 (9th Cir.1986).  "Severability is determined by the intent and the actions

9  of the contracting parties. Severability is a question whether parts of a contract or lease,

10 or part performance thereunder, can be separated and treated as independent legal

11 obligations."  *In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 845 (Bankr.

12 C.D. Cal. 1999), *citing In re Qintex Entertainment, Inc.*, 950 F.2d 1492, 1496 (9th Cir.

13 1991).

14         Here, the Subleases contain three distinct and severable agreements—namely,

15 (1) a lease for real property (i.e., the Properties), (2) a licensing agreement for the

16 Trademark, and (3) a financing agreement (erroneously characterized as a lease) for the

17 Equipment.  The intent of the parties to treat each component as a separate agreement

18 is evident from the terms and structure of the Subleases.

19         First and foremost, the consideration due under the Subleases varies

20 substantially for the Properties versus the Equipment and Trademark.  Under the terms

21 of the Subleases, the consideration for the use of the Properties comes in the form of

22 rent, which consists of a monthly base rent (section 4.1), adjustments to monthly base

23 rent to account for the minimum rent due under the Master Leases (section 4.2), and

24 "Additional Rent" (section 4.3) pertaining to the use of common areas.  *See* Exhibit D at

25 pp. 2-4, Exhibit E at pp. 2-4, and Exhibit F at pp. 2-4.  The consideration for the

26 Equipment, on the other hand, is markedly different.  More precisely, the Subleases

27 require fixed monthly payments for a defined term (i.e., the initial term of the Sublease)

28 in an amount equal to the amortized purchase price of the Equipment plus six percent

- 14 -

MOTION

1    (6%) *per annum*.[9]  *See* Exhibit D at pp. 5-6, Exhibit E at p. 6, and Exhibit F at p. 6.

2    Likewise, the Trademark license has a consideration structure wholly independent of the

3    lease of the Properties or purchase of the Equipment.  Per the Terms and Conditions of

4    Trademark License, which is a self-contained agreement merely appended to the

5    Subleases, the Hoag Debtors are required to pay a royalty for the use of the

6    Trademark—namely, one percent (1%) of "New Patient Revenues" (as defined in the

7    Subleases).  *See* Exhibit D at pp. 3-4, 26, Exhibit E at pp. 3-4, 24, and Exhibit F at pp. 3-

8    4, 24.  The consideration for each portion of the Subleases is wholly independent of the

9    other rights.

10           Additionally, the nature of the agreements pertaining to the Assets differ

11    substantially.  With respect to the Properties, the Subleases constitute a true lease—i.e.,

12    an agreement by which the Hoag Debtors were granted the temporary right to use and

13    occupy the Properties in exchange for payment of a fixed amount related to the value of

14    occupancy, not the value of the Properties themselves.  *See* Exhibit D at p. 2, Exhibit E

15    at p. 2, and Exhibit F at p. 2.  The treatment of the "lease" for the Equipment is

16    substantially different.  More precisely, the "lease" for the Equipment is not actually a

17    lease; rather, the Subleases (as they pertain to the Equipment) are intended to

18    effectuate an "installment sale" of the Equipment to the Hoag Debtors.  *See* Exhibit D at

19    pp. 3-4, Exhibit E at pp. 3-4, and Exhibit F at pp. 3-4.  In other words, Newport is <u>not</u>

20    leasing the Equipment to the Hoag Debtors, as assignees.  To the contrary, Newport

21    purchased the Equipment for Debtor with the express understanding that Debtor would

22    repay Newport the cost of the Equipment plus financing costs—a structure referred to by

23    Newport in the Subleases as an "installment sale."[10]  The Trademark license contains

24    _____

25    [9] Section 9 of the Subleases also permits the Hoag Debtors to purchase the Equipment at the end of the "lease" for
       one dollar ($1.00).

26    [10] As discussed further in the *Debtors' Opposition to Amended Motion for Relief from the Automatic Stay under 11
       U.S.C. § 362* and related declarations [D.E. 160-162], the Subleases as they pertain to the Equipment constitute

27    financing agreements.  As such, there is no need for the Hoag Debtors to assume those portions of the Subleases.  *See*
       11 U.S.C. § 365.  That being said, the Hoag Debtors do not seek a determination that the Subleases as they pertain to

28    the Equipment constitute financing agreements.  Such relief shall be sought via a subsequent adversary proceeding.
       The Court, however, need not determine whether the Subleases as they pertain to the Equipment constitute financing
       agreements in order to determine that the Subleases are severable.  Rather, the Court may determine that the

MOTION

1    yet another, independent compensation structure wholly unlike the consideration related

2    to the Properties and the Equipment.  More precisely, the consideration for the

3    Trademark license is dependent on a percentage of net patient revenues.  *See* Exhibit D

4    at pp. 3-4, Exhibit E at pp. 3-4, and Exhibit F at pp. 3-4.

5            The structure of the Subleases further demonstrate that the Subleases are

6    comprised of three separate agreements.  The most glaring indication of this fact

7    pertains to the Trademark.  Indeed, the use of the Trademark is subject to three

8    trademark license agreements that are merely appended to the Subleases.  *See* Exhibit

9    D at pp. 22-28, Exhibit E at pp. 21-27, and Exhibit F at pp. 21-26.  These trademark

10   licenses are self-contained documents that set forth all relevant terms regarding the use

11   of the Trademark, including the term and manner of use, and the compensation payable

12   for the use of the Trademark.  *Ibid.*  In fact, each of the trademark license agreements

13   contain integration clause, which provides as follows:

14           This Memorandum, including attached Schedules[,] contains the entire
             agreement of the parties with respect to the Property, and any and all prior
15           agreements relating to the Property are superseded in their entirety.

16   *See* Exhibit D at p. 27, Exhibit E at p. 26, and Exhibit F at p. 26.  The inclusion of such a

17   provision unambiguously demonstrates that the Trademark licenses are entirely

18   separate agreements from the leases of the Properties and financing agreements for the

19   Equipment.

20           Similarly, the structure of the Subleases also demonstrates that the provisions

21   pertaining to the Equipment were intended to be separate and apart from the lease of

22   the Properties and license of the Trademark.  With respect to the Equipment, the

23   Subleases provide that Newport shall purchase the Equipment on behalf of Debtor and

24   the Hoag Debtors and, thereafter, "lease" the Equipment to Debtor and the Hoag

25   Debtors until Newport receives payment of the purchase price plus interest at six percent

26   (6%) as well as a nominal buy-out payment of one dollar ($1.00).  *See* Exhibit D at p. 5,

27   _____

28   Subleases are severable based on the substantial and fundamental differences between the Subleases as they pertain
     to the Properties, Equipment and Trademark, and reserve the question of whether the portions of the Subleases
     pertaining to the Equipment constitute a financing agreement for later adjudication.

MOTION

1    Exhibit E at p. 6, and Exhibit F at p. 6.  This financing arrangement is wholly separate

2    and apart from the lease of the Properties or the license of the Trademark and, indeed,

3    is not premised on the continued occupancy of the Properties.  In other words, Debtor

4    and/or the Hoag Debtors could elect to pay-off the balance owing under the financing

5    agreement for the Equipment at any time and, thereafter, remove the Equipment from

6    the Properties and use the Equipment in any manner Debtor and/or the Hoag Debtors

7    saw fit.  *Ibid.*

8         In an effort to dispute the severability of the Subleases, Newport merely contends

9    that the Subleases are indivisible because they are a single document and the

10   Subleases do not contain any provisions permitting the Hoag Debtors to sever the

11   Subleases.  Once again, however, Newport's argument is demonstrably incorrect.  First,

12   and as discussed *supra*, the Subleases are not a single document.  Indeed, the

13   agreement governing the use of the Trademark is a wholly separate and self-contained

14   agreement Newport merely appended to the Subleases.  *See, generally,* Exhibit D at pp.

15   22-28, Exhibit E at p. 21-26, and Exhibit F at pp. 21-26.  However, even assuming,

16   *arguendo*, that the Subleases were comprise of a single document, such a fact would

17   not preclude a finding that the components of the Subleases were divisible.  First and

18   foremost, such a ruling would contravene existing law.  Secondly, adoption of the rule

19   advanced (and erroneously relied upon by Newport) would eviscerate the rule in its

20   entirety as the rule is specifically designed to address the circumstance where a single

21   document embodies multiple, independent agreements.

22        Furthermore, the Subleases do permit the Hoag Debtors to sever the Subleases.

23   This fact is most evident from the severability clauses of the Subleases.  *See* Exhibit D

24   at p. 17, Exhibit E at p. 17, and Exhibit F at p. 17.  Additionally, the provisions related to

25   the Equipment also contemplate the severance of this portion of the agreement upon

26   payment in full.  Under Section 9 of the Subleases, the Hoag Debtors may purchase the

27   Equipment at any time for an amount equal to the payments owing under the "lease"

28   (i.e., the purchase price plus a financing fee of six percent (6%) per annum) plus one

MOTION

dollar ($1.00).  *See* Exhibit D at p. 5, Exhibit E at p. 6, and Exhibit F at p. 6.  Upon

payment in full, Newport is obligated to assign all of its rights to the Equipment to Debtor

and, thereafter, the Equipment shall be solely owned by Debtor.  *Ibid.*  Indeed, the

Subleases expressly provide that upon sale, the Equipment "shall no longer be subject

to any rental or other obligations herein."  *Ibid.*  Accordingly, not only may the Hoag

Debtors sever the Equipment portions of the Subleases, such provisions are rendered

moot automatically upon the Hoag Debtors' acquisition of the Equipment.  In other

words, the Subleases are drafted in a manner that envisions the severability of the

Equipment-related provisions from the remaining provisions of the Subleases.

In sum, the Subleases are not consolidated agreements pertaining to the Assets

as a whole.  To the contrary, the Subleases are comprised of three distinct

agreements—a real property lease, a trademark license, and an equipment purchase

and financing agreement.  As such, these components of the Subleases must be

severed and, for the purposes of section 365, treated individually.

> **B.    The Hoag Debtors May Assume the Portions of the Subleases**
> **Pertaining to the Properties**

By and through the Hoag Motion, the Hoag Debtors seek to assume the

Subleases as they pertain to the Properties and assign the same to Purchasers.

> ***1.    The Hoag Debtors may Assume the Subleases***

Under section 365(a), a chapter 11 Debtor in possession, "subject to the court's

approval, may assume or reject an executory contract or unexpired lease of the Debtor."

11 U.S.C. § 365(a).  In evaluating a request to assume an executory contract or

unexpired lease, "a bankruptcy court need engage in 'only a cursory review of a [Debtor-

in-possession]'s decision to [assume or] reject the contract.  Specifically, a bankruptcy

court applies the business judgment rule to evaluate a [Debtor-in-possession]'s

[assumption or] rejection decision ...." *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d

665, 670 (9th Cir. 2007), *quoting Durkin v. Benedor Corp. (In re G.I. Indust., Inc.)*, 204

F.3d 1276, 1282 (9th Cir. 2000); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523

- 18 -

MOTION

1  (1984); *see also In re Chi-Feng Huang*, 23 B.R. 798, 800 (9th Cir. BAP 1982).  As noted

2  in *Pomona Valley Medical Group*,

3
4
5

> We have never had the occasion to define the contours of the business judgment rule in the bankruptcy context. However, courts are no more equipped to make subjective business decisions for insolvent business than they are for solvent businesses, so we have no difficulty concluding that its formulation in corporate litigation is also appropriate here.

6  476 F.3d at 670, *citing See Lubrizol Enter. v. Richmond Metal Finishers,* 756 F.2d 1043,

7  1047 (4th Cir.1985) (adopting the corporate business judgment rule for bankruptcy

8  proceedings).

9        Accordingly, in evaluating a decision to assume or reject an executory contract or

10  unexpired lease, "the bankruptcy court should presume that the Debtor-in-possession

11  acted prudently, on an informed basis, in good faith, and in the honest belief that the

12  action taken was in the best interests of the bankruptcy estate."  *Ibid*; *see Navellier v.*

13  *Sletten,* 262 F.3d 923, 946 n. 12 (9th Cir.2001); *FDIC v. Castetter,* 184 F.3d 1040, 1043

14  (9th Cir.1999); *see also In re Chi-Feng Huang,* 23 B.R. at 801 ("The primary issue is

15  whether rejection would benefit the general unsecured creditors.").  Accordingly, the

16  bankruptcy court should approve the assumption or rejection of an executory contract or

17  unexpired lease under section 365(a) "unless it finds that the Debtor-in-possession's

18  conclusion that [assumption or] rejection would be 'advantageous is so manifestly

19  unreasonable that it could not be based on sound business judgment, but only on bad

20  faith, or whim or caprice.'"  *Pomona Valley Med. Grp., Inc.*, 476 F.3d at 670, *quoting*

21  *Lubrizol Enter. v. Richmond Metal Finishers,* 756 F.2d at 1047.

22              *a.*      Assumption Serves the Best Interests of the Estate

23        As a threshold matter, the Subleases are subject to assumption under section

24  365(a).  The two statutory prerequisite to assumption are (1) that the subject lease or

25  agreement qualified as an unexpired lease or executory contract as of the petition date

26  in the bankruptcy case and (2) that the subject lease or agreement constitute a lease or

27  agreement of the Debtor.  Per their terms, the Subleases constitute unexpired leases

28  within the meaning of section 365(a).  More precisely, the Anaheim Sublease terminates

MOTION

1    in or about August 2021,[11] the Huntington Sublease terminates on or about October 31,

2    2021, and the Tustin Sublease terminates on or about April 30, 2021.  Additionally, as

3    discussed *supra*, as assignees of Debtor, the Subleases constitute unexpired leases of

4    the Hoag Debtors.

5         Additionally, based on the circumstances presented, the Hoag Debtors have

6    concluded that the assumption of the Subleases serve the best interests of the estates

7    and their respective creditors.  The Subleases pertain to the Properties.  At present, the

8    Hoag Debtors operate the Hoag Clinics from the Properties.  The Hoag Clinics

9    represents a major source of income for the Estates.  If the Hoag Debtors are unable to

10   assume the Subleases, the Hoag Debtors will not only be unable to continue operating,

11   the Debtors will be unable to consummate the proposed Sale to Purchasers—a Sale that

12   provides substantially more benefit to the Estates than the Opus Agreement and

13   represents the only potential for distributions to creditors (other than Opus).  Based on

14   the foregoing, the Hoag Debtors believe, in their sound business judgment, that the

15   assumption of the Subleases is not only beneficial to creditors, it is essential to the

16   administration of the Bankruptcy Cases.  In addition to the benefits of assumption, the

17   assumption of the Subleases is not likely to place any undue burdens on the Estates.

18                    *b.*        *The Hoag Debtors have Provided Adequate Assurance of*

19                                *Future Performance and shall Cure any Arrears Relating to*

20                                *the Properties*

21         Pursuant to section 365(b)(1), "[i]f there has been a default in an executory

22   contract or unexpired lease of the debtor, the trustee may not assume such contract or

23   lease unless, as the time of assumption of such contract or lease, the trustee...(A) cures,

24   or provides adequate assistance that the trustee will promptly cure, such default … [¶] …

25   and (C) provides adequate assurance of future performance under such contract or

26

---

27   [11] The termination dates provided herein refer to the initial terms of the Subleases, without any extensions thereof.
The term for the Anaheim Sublease is not expressly defined; rather, the term is ten (10) years from the "Turnover
Date" (as therein defined).  The Hoag Debtors believe the "Turnover Date" occurred shortly after the execution of the

28   Anaheim Sublease on or about August 22, 2011.  In any event, the initial term of the Anaheim Sublease expires no
earlier than August 22, 2021—ten (10) years from the execution of the Anaheim Sublease.

MOTION

1  lease." 11 U.S.C. § 365(b)(1).  Following the appointment of the Receiver, the Hoag

2  Debtors committed one or more monetary defaults under the Subleases due to the

3  Receiver's failure to make the requisite payments.  Accordingly, in order to assume the

4  Subleases, the Hoag Debtors must satisfy section 365(d)(1).

5          Based on the Hoag Debtors' books and records, the Hoag Debtors believe that

6  they are current on all rental obligations related to the use and occupancy of the

7  Properties following the Petition Date.  Prior to the Hoag Debtors bankruptcy filing, the

8  Receiver failed to make two monthly payments under the Subleases.  Based on the

9  base rent under the Subleases plus applicable late fees, the Hoag Debtors estimate that

10 the Receiver failed to pay approximately $63,801.74 in rent for the use and occupancy of

11 the Properties.  Accordingly, prior to or through the Sale, the Hoag Debtors shall cure

12 this default in order to permit the assumption of the Subleases.  Debtor does not have

13 funds sufficient to cure this default.  As the sale hearing is scheduled for December 13,

14 2017—approximately two (2) weeks after the scheduled hearing for the Hoag Motion—

15 the Hoag Debtors will be able to promptly cure any and all arrears under the Subleases

16 pertaining to the lease of the Properties.

17         With respect to adequate assurance of future performance, section 365(b)(3)

18 provides as follows:

19         (3) For the purposes of paragraph (1) of this subsection and paragraph
           (2)(B) of subsection (f), adequate assurance of future performance of a
20         lease of real property in a shopping center includes adequate assurance—

21               (A) of the source of rent and other consideration due under such
                 lease, and in the case of an assignment, that the financial condition
22               and operating performance of the proposed assignee and its
                 guarantors, if any, shall be similar to the financial condition and
23               operating performance of the Debtor and its guarantors, if any, as of
                 the time the Debtor became the lessee under the lease;
24
                 (B) that any percentage rent due under such lease will not decline
25               substantially;

26               (C) that assumption or assignment of such lease is subject to all the
                 provisions thereof, including (but not limited to) provisions such as a
27               radius, location, use, or exclusivity provision, and will not breach any
                 such provision contained in any other lease, financing agreement, or
28               master agreement relating to such shopping center; and

                                                              - 21 -

MOTION

1
2

      (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b).

3
4
5
6
7
8
9
10
11

*Source of Rent and Other Consideration.*  The Hoag Debtors continue to operate the Hoag Clinics.  As set forth in the monthly operating reports and cash flow projections, the Hoag Debtors have sufficient cash flow to pay the consideration due under the Subleases pertaining to the use and occupancy of the Properties—a fact demonstrated by the payment of the rent related to the use and occupancy of the Properties since the commencement of the Bankruptcy Cases while maintaining operations and complying with the terms of the Court-approved cash collateral budget.  A true and correct copy of the Hoag Debtors' most recent cash flow projection is attached to the Amster Declaration as Exhibit J.

12
13
14

*Percentage Rent.*  The Subleases do not require the payment of a percentage rent in relation to the use and occupancy of the Properties.  As such, this factor is inapplicable.

15
16

*Assumption Subject to Terms of Subleases.*  The Hoag Debtors intend to assume the portions of the Subleases pertaining to the Properties subject to the terms thereof.

17
18
19
20

*Tenant Mix or Balance.*  Following assumption, the Hoag Debtors intend to continue operating the Hoag Clinics until the sale of the Hoag Debtors and/or their assets to Purchaser, or the party offering the highest and best bid following the overbid auction.  Accordingly, pending a sale, the use of the Properties shall be unchanged.

21
22
23

Based on the foregoing, the Hoag Debtors respectfully submit that the requirement of section 365(b)(1) have been met and, as such, the Hoag Debtors are entitled to assume the Subleases.

24
25

     c.    *The Hoag Debtors are not Subject to any Restrictions on the Assumption of the Subleases*

26
27
28

In pertinent part, section 365(c) provides that a Debtor in possession "may not assume … any executory contract or unexpired lease of the Debtors, whether or not

MOTION

1  such contract or lease prohibits or restricts assignment of rights or delegation of duties, if

2  … [¶] … (3) such lease is of nonresidential real property and has been terminated under

3  applicable nonbankruptcy law prior to the order for relief." 11 U.S.C. § 365(c)(3).  As

4  discussed *supra*, the Subleases were in full force and effect as of the Petition Date.

5  Accordingly, section 365(c)(3) is inapplicable and the Hoag Debtors may assume the

6  Subleases.

7          Moreover, Newport has expressed its intention to surrender its interest under the

8  Master Leases if the Motion is granted in a transparent attempt to frustrate the proposed

9  Sale and, thus, the administration of the Bankruptcy Cases.  Regrettably for Newport,

10  the surrender of their interests in the Master Leases could not, as a matter of established

11  California law, affect the interests of the Hoag Debtors under the Subleases or Sub-

12  subleases.  .  *See Buttner v. Kasser*, 19 Cal.App. 755, 760 (1912) ("A tenant may

13  surrender his estate to his landlord, but if he have since its commencement created

14  some minor interest out of it, or have made an underlease, he cannot, by surrendering,

15  destroy the charge or affect the estate of the underlessee."); *Northridge Hosp. Found. v.*

16  *Pic 'N' Save No. 9 Inc.*, 187 Cal. App. 3d 1088, 1094–95 (Ct. App. 1986) ("The general

17  rule is that the rights of a subtenant cannot be affected by a voluntary surrender of the

18  master lease."); *see* Ex. A, at p. 51 (Art. 56) (California law applies); Ex. B, at p. 13

19  (¶ 29) (California law applies); and Ex. C, at pp. 13-14 (¶ 29) (California law applies).

20  Furthermore, Newport cannot (without breaching the Subleases) surrender or otherwise

21  cancel its interests in the Master Leases.  More precisely, per paragraph 26 of the

22  Subleases, in the event that Newport decides to surrender its interests under the Master

23  Leases, Newport must immediately notify the Hoag Debtors and, therefore, assign its

24  interests under the Master Leases to the Hoag Debtors without consideration.  *See* Ex.

25  D, at p. 16, Ex. E, at p. 16, and Ex. F, at p. 16.  As such, any right to surrender cannot

26  (as a matter of law) affect the rights of the Hoag Debtors to use and occupy the

27  Properties or assume and assign their interests under the Subleases in accordance with

28  section 365.

- 23 -

MOTION

**VII.    CONCLUSION**

WHEREFORE, the Debtor respectfully request that the Court enter an order (1) granting the Motion in its entirety, (2) finding notice of the motion due and proper, (3) finding the Hoag Debtors constitute the true lessees under the Subleases by virtue of an assignment of Debtor's rights and interest therein to the Hoag Debtors via the Sub-subleases, (4) finding that the Debtor may sell and contemporaneously assign its bare legal interest in the Subleases to the Hoag Debtors pursuant to 11 U.S.C. §363(b) or, in the alternative, finding that Debtor may assume the Subleases and assign the Subleases to the Hoag Debtors with any cure amounts outstanding on the Subleases to be paid through close of escrow on the Sale, and (7) granting any further or additional relief requested.

Dated:  November 23, 2016          LOBEL WEILAND GOLDEN FRIEDMAN LLP

                                   By:    _/s/ Jeffrey I. Golden_
                                          JEFFREY I. GOLDEN, Attorneys for Your
                                          Neighborhood Urgent Care, LLC, Debtor and
                                          Debtor-in-Possession

MOTION

1

## DECLARATION OF ROBERT C. AMSTER

2

3   I, Robert C. Amster, declare as follows:

4   1.  I have personal knowledge of the facts set forth in this Declaration and, if

5 called as a witness, could and would testify competently to such facts under oath.

6   2.  The Hoag Debtors operate three urgent care facilities (the "Hoag Clinics"),

7 which are located at 5630 Santa Ana Canyon Road, Anaheim, California (the "Anaheim

8 Property"), 5355 Warner Avenue, Suite 102, Huntington Beach, California (the

9 "Huntington Property"), and 2560 Bryan Avenue, Tustin, California (the "Tustin Property"

10 and, together with the Anaheim Property and Huntington Property, the "Properties").

11   3.  In the process of establishing the Hoag Clinics, the Hoag Debtors and

12 Debtor, the former management company for the Hoag Debtors,[12] entered into a series

13 of agreements with Newport.

14   4.  The agreements include a structured leasing of the property by which

15 Newport leased the Properties from the Landlords and, shortly thereafter, subleased the

16 Properties to Debtor.  True and correct copies of the leases between Newport and the

17 Landlords (the "Master Leases") are attached as Exhibits A-C.  True and correct copies

18 of the Subleases, as may have been modified and/or amended from time to time,

19 between Newport and Debtor and the Hoag Debtors are attached as Exhibits D-F.

20   5.  In general, the Subleases are comprised of three distinct agreements—

21 namely, (a) a lease of the Properties to Debtor for the term of the Master Leases; (b) a

22 financing agreement for the acquisition of certain medical and diagnostic equipment

23 (collectively, the "Equipment"); and (c) a license for the use of the trademark or trade

24 name "Hoag Urgent Care" (the "Trademark" and, together with the Properties and the

25 Equipment, the "Assets").  *See, generally,* Exhibits D-F.  The salient terms of the Master

26 Leases are incorporated into the Subleases—thereby binding Debtor to the terms of the

27 Master Leases.

28

---

[12] The Hoag Debtors are presently managed by Radiant Physician Group ("RPG").

- 25 -

MOTION

6.      Simultaneously with the execution of the Subleases, Debtor entered into "sub-subleases" with the Hoag Debtors (collectively, the "Sub-subleases").  A true and correct copy of the sub-sublease for the Anaheim Property is attached as Exhibit G.

7.      It was the intention of Debtor and the Hoag Debtors that the Sub-subleases effectuate an assignment of all rights of Debtor under the Subleases to the Hoag Debtors.  Under the Sub-subleases, Debtor granted the Hoag Debtors the exclusive right to utilize the entirety of the Properties for the duration of the Subleases.

8.      Debtor also granted the Hoag Debtors its rights with respect to the Equipment and Trademark under the Subleases.  Newport consented to Debtor "sub-subleasing" all rights conferred under the Subleases to the Hoag Debtors.  Thereafter, the Hoag Debtors utilized the Assets in the operation of the Hoag Clinics in accordance with the terms of the Subleases.  Prior to the appointment of the receiver (as discussed *infra*), the Hoag Debtors (not Debtor) made nearly all of the payments under the Subleases directly to Newport and, with rare exception, satisfied the obligations of Debtor due under the Subleases.

9.      Prior to the commencement of their bankruptcy cases, and thereafter, the Hoag Debtors marketed their businesses and/or assets for sale in an effort to generate the maximum value for the benefit of their creditors.  In order to facilitate a sale of the Hoag Debtor's assets ("Sale"), the Hoag Debtors must assume and assign their rights and interests in the Properties under the Subleases and Subsubleases.

10.     As part of the proposed Sale, the Hoag Debtors desire to sell and purchaser seeks to acquire the Subleases and operations thereunder.   As such, the Hoag Debtors intend to assume the Subleases and assign them to the proposed purchaser.

MOTION

11.    In order for this assumption by Hoag Debtors to take effect, the Debtor seeks to sell and contemporaneously assign its bare legal interest in the Subleases to the Hoag Debtors.  In the alternative, the Debtor seeks to assume the Subleases and assign the Subleases to the Hoag Debtors.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 27th day of November, 2017, at Costa Mesa, California.

_____
Robert C. Amster

- 27 -

# EXHIBIT A

# SUBLEASE AGREEMENT

THIS SUBLEASE AGREEMENT (the "Sublease") is made and entered into as of the 22nd day of August, 2011, by and between **Newport Healthcare Center LLC**, a Delaware limited liability company ("Sublessor") and **Your Neighborhood Urgent Care, LLC**, a California limited liability company ("Sublessee").

## RECITALS

A.    Sublessor leases certain medical office space in the Crossroads Center, located at 5630 Santa Ana Canyon Road, Anaheim, California (the "Master Premises"), pursuant to the Lease dated August_, 2011, by and between Sunbelt Corp. Center II, Inc. ("Landlord"), and Newport Health Care Center LLC as tenant ("the **Master Lease**"). A copy of the Master Lease is attached to this Sublease as **Exhibit "A"**, which is incorporated by this reference.

B.    Sublessor desires to sublease a portion of the Master Premises comprising approximately 3287 square feet (the "Premises") to Sublessee, shown as crosshatched on Exhibit B attached hereto, including all leasehold improvements and trade fixtures located in the Premises, and Sublessee desires to sublease the Premises from Sublessor pursuant to the terms and conditions contained in this Sublease. The Premises comprise approximately **52.888%** of the total square feet of the Master Premises  (the **"Applicable Share"**).

C.    Sublessee intends to concurrently herewith sublease the Premises to a California professional corporation that will own and operate an urgent care center at the Premises ("P.C. Subtenant"), as evidenced by a sublease between Sublessee and PC Subtenant to be executed concurrently herewith (the "PC Sublease").

D.    Sublessor shall concurrently with the execution of the Master Lease cause the Landlord to execute a consent to this Sublease and a consent to the PC Sublease in a form acceptable to Sublessee and Sublessor (the "Landlord Consent") and in accordance with the provisions herein.

**NOW, THEREFORE,** in consideration of the above recitals, the terms and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Creation of Sublease**. Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor the Premises.  Sublessee shall use and occupy the Premises in accordance with the terms and conditions contained in this Sublease.

2.    **Acceptance of Premises**. The commencement of the use and occupancy of the Premises by Sublessee shall conclusively constitute an agreement by Sublessee that the Premises is acceptable to the extent that Sublessor accepts the Premises under the provisions of the Master Lease.

agr1\crosssub3b                                     1
August 17, 2011

010

3.     **Term**. The term of this Sublease shall commence on the Turnover Date (as defined in the Master Lease) (the "Commencement Date"), and shall continue thereafter for 120 months ("Base Term"); provided that if the Commencement Date is not the first (1st) day of the month then, for the sole purpose of calculating the expiration date of the Base Term, the Base Term shall be deemed to have commenced on the first (1st) day of the month following the Commencement Date. If Sublessor extends the term of the Master Lease beyond the Base Term (i.e. the Master Lease contains two (2) five (5) year renewal options), or if Sublessee elects to extend the term of the Master Lease as provided for herein then Sublessee shall have the right to extend this Sublease for a like period of time, except that this Sublease term shall be extended by the time period that Sublessee extends the Master Lease. In no event shall the term of this Sublease extend beyond the end of the term of the Master Lease, plus renewal terms to the extent exercised. In addition, this Sublease shall immediately terminate effective as of the expiration without renewal or the earlier termination of the Master Lease.

4.     **Rent**.

4.1     **Monthly Base Rent**. Sublessee shall pay to Sublessor, as monthly base rent for the Premises, without deduction, offset, prior notice or demand (except as expressly otherwise provided in this Sublease), an amount equal to Three Dollars-and-Fifty-Cents per square foot per month or Eleven Thousand Five  Hundred and Four Dollars and Fifty Cents ($11,504.50) per month ("Monthly Base Rent"). Sublessor warrants and represents that the Monthly Base Rent includes the monthly amount of approximately Fifty Cents ($.50) per square foot which is for the tenant improvement allowance for the tenant improvements constructed at the Premises plus interest on the funds expended for such improvements. Rent shall be due on or before the first (1st) day of each month during the term of this Sublease, commencing on the Rent Commencement Date of the Master Lease. Rent for any period during the term of this Sublease which is for less than one (1) month shall be a prorated based upon a thirty (30) day month. Rent shall be paid to Sublessor at its address for notice or to such other person or address as Sublessor will from time to time designate in writing. Sublessee agrees to pay Sublessor a late charge of five percent (5%) of the amount of rent which is not paid within five (5) days of that rent's due date. Notwithstanding any provisions herein to the contrary, the Monthly Base Rent and all other Additional Rent (as defined in Section 4.3.1 herein) shall be abated, to the extent, based on the Applicable Share and on a dollar for dollar basis that such rents are abated for any reason under the Master Lease, as  reasonably determined by Sublessor, excluding any free rent at the inception of the Master Lease, but including, without limitation, any rents that are subject to abatement or offset due to interruption of services, or with respect to early possession, casualty or condemnation events or otherwise, as expressly provided for in the Master Lease. Sublessor shall offset as credit against future rents owed herein any monies received from Landlord that relate to rents or Additional Rent under the Master Lease.

4.2     **Base Rent Adjustments**. In accordance with the Master Lease, the portion of the Monthly Base Rent that is defined as the "Fixed Minimum Rent" under the Master Lease shall be increased on the same percentage basis that such rent is increased for any reason under the Master Lease.

agr1\crosssub3b
August 17, 2011

2

011

4.3 **Additional Rent.**

4.3.1 <u>Master Lease Amounts.</u> In addition to the Monthly Base Rent, throughout the term of this Sublease, Sublessee shall also be responsible for payment of the Applicable Share, as reasonably determined by Sublessor, of any other sums due and payable by Sublessor under the Master Lease (which amounts, if any, are referred to in this Sublease as "Additional Rent"). All such Additional Rent shall be due and payable within ten (10) days after notice from Sublessor that the Additional Rent is due, provided Sublessor also sends with such notice any written documentation it receives from the Landlord with respect to such Additional Rent. The term "Rent" as used in this Sublease shall mean the Monthly Base Rent and all Additional Rent.

4.3.2 <u>Master Lease Common Area Expenses.</u> The parties agree that the Monthly Base Rent payable under this Sublease shall be on a "triple net lease" basis, and therefore, in addition to the Monthly Base Rent described in Section 4.1 above, to the extent expressly provided for in the Master Lease, Sublessee shall be responsible commencing as of the date of possession of the Premises by Sublessor under the Master Lease, for its pro rata share (based on the Applicable Share as reasonably determined by Sublessor) of all common area (interior and exterior) maintenance charges, operating costs and any and all other building expenses that are passed through from, or charged by, the Landlord to Sublessor pursuant to the Master Lease. In addition, to the extent expressly provided for in the Master Lease, Sublessee shall be solely responsible for the Applicable Share (as reasonably determined by Sublessor) of all operating and maintenance costs associated with maintaining the Premises, including without limitation commercial general public liability insurance covering the Premises, professional liability insurance covering the professional services rendered in the Premises, fire and extended insurance coverage, utility costs and expenses at the Premises, including all water, electricity, gas, heat and telephone charges, ordinary repairs, utilities, janitorial and waste removal services, and any personal property taxes and assessments charged on the use or occupancy of the Premises. By way of clarification, Sublessee shall not be responsible for any of the items listed or described in this Section 4.3.2 if not payable by Sublessor under the express provisions of the Master Lease.

4.3.3 <u>Lease of Leased Assets.</u> In addition to the Monthly Base Rent, throughout the term of this Sublease, Sublessee shall also pay to Sublessor any monthly amounts due for the total monthly rent reflected in the IERs for the Leased Assets (as both terms are defined in Section 7 below), and, as provided for herein or in the IER described herein, such amounts may be reduced to zero on or before the end of the initial term of the Sublease. The amounts are based upon an installment sale of certain of the Leased Assets as described in Section 9 below. The specific equipment that shall be leased and the specific monthly rental amounts for such Leased Assets shall be as reflected in the IERs as mutually agreed upon from time to time by Sublessor and Sublessee.

4.3.4 <u>Trademark License.</u> In addition to the Monthly Base Rent, throughout the term of the Sublease during the term of the Trademark License attached hereto as

agr1\crosssub3b
August 17, 2011

3

Exhibit B1, Sublessee shall also pay to Sublessor a royalty equal to one percent (1%) of the New Patient Revenue from the Premises (as hereinafter defined), payable quarterly on or before the last day of each month following the end of each calendar quarter (e.g., for the calendar quarter ending December 31, payable on the last day of January). For purposes of this Agreement, "New Patient Revenue" means the total revenue received by P.C. Subtenant (as defined here) in consideration of services provided by P.C. Subtenant to patients of P.C. Subtenant, net of contractual allowances and adjustments.

5.   **Master Lease**.

5.1   **Subject to the Master Lease.**  Prior to the occupancy of the Premises, Sublessee shall first familiarize itself with all of the terms and conditions contained in the Master Lease. This Sublease is subordinate to the Master Lease and is subject to all of the terms and conditions of the Master Lease.

5.2   **Incorporated Provisions of the Master Lease.**  Except for the payment of rent, additional rent or any other amounts under the Master Lease directly to Landlord, all of the provisions of the Master Lease are hereby incorporated into this Sublease by this reference. In this regard, any rights that Landlord may have against Sublessor pursuant to the Master Lease, Sublessor shall hereby have equivalent rights against Sublessee pursuant to this Sublease, and any rights which Sublessor may have against Landlord under the Master Lease, Sublessee shall have equivalent rights against Sublessor. Should an express provision of this Sublease conflict with the Master Lease, then the express provision of this Sublease shall govern as between Sublessor and Sublessee.

5.3   **No Breach of Master Lease; Indemnification.**  While this Sublease is in effect, Sublessee shall not do anything on or about the Premises which would constitute a breach of the Master Lease, and Sublessee hereby indemnifies Sublessor for any and all costs and expenses, including, without limitation, reasonable attorney fees,  incurred by Sublessor against Landlord for any action or activity of Sublessee (or Sublessee's employees, agents or invitees) which would constitute a breach of the Master Lease. In the event that Sublessee holds over its occupation of the Premises after the termination of the Master Lease, Sublessee shall be solely responsible for all obligations under the Master Lease, and Sublessee hereby indemnifies Sublessor for any and all costs and expenses, including, without limitation, reasonable attorney fees,  incurred by Sublessor for Sublessee's holding over its occupancy of the Premises.

5.4   **Excluded Provisions of the Master Lease.**  Notwithstanding Sections 5.1 through 5.3 above, the following provisions of the Master Lease are excluded from this Sublease: 1.1(h), 1.1(k), 1.2(f), 3.1, 3.2(b), 4.1, Exhibit "E".

6.   **Exclusive and Permitted Use of Premises.**  During the term of this Sublease, Sublessee shall have the exclusive right (to the extent such exclusive rights are granted to Sublessor by Landlord under the Master Lease with respect to the **"Urgent Care Protected Use"** as defined in Section 8.8 of the Master Lease) to use of the Premises for Urgent Care Protected Use. In addition, Sublessee shall use the Premises only for **"Urgent Care Use"** only as defined

agr1\crosssub3b                        4
August 17, 2011

013

in Section 1.1(i) of the Master Lease. Except as otherwise set forth in this Sublease, and only to the extent of Sublessor's obligations under the Master Lease, Sublessee shall maintain, repair and keep in good condition the Premises, including without limitation any and all leasehold improvements and fixtures contained therein. In addition, Sublessee may not conduct any use that would cause Sublessor to be in violation of any term or condition of the Master Lease.

7.    **Maintenance and Repair.** Sublessee, at Sublessee's sole cost and expense, shall keep the Premises, and the "Leased Assets" which shall include all fixtures, trade equipment, trade fixtures, furniture, and other personal property leased to Sublessee pursuant to this Sublease in good condition and repair and in compliance with all applicable laws. Each item ("Item") of Leased Assets is listed on a separate Individual Equipment Record attached hereto as Exhibit C (each an "Individual Equipment Record" or "IER") and the rents due (which shall be paid monthly as provided for in Section 4.3.3 herein ) with respect to such Item are specified therein. Sublessor shall not be responsible to make any repairs or maintenance to the Premises or the Leased Assets. Sublessee shall be responsible for any replacements due to failure, unless damage or such failure is caused by the act, omission, or active negligence, of Sublessor and/or its agents, employees. The Premises shall at all times be kept clean, safe and sanitary and, to the extent of Sublessor's obligations under the Master Lease, in good order, condition, replacement and repair by Sublessee.

8.    **Trademark and License.** During the term of this Sublease, Sublessee and P.C. Subtenant shall have a limited, non-exclusive, non-transferable and revocable license to use name "Hoag" in connection with the conduct of the urgent care center business on the Premises, subject to the terms and conditions of the Trademark and License by and among Sublessor, Sublessee and P.C. Subtenant, in the form attached hereto as Schedule C.

9.    **Lease of Leased Assets** Sublessor hereby leases to Sublessee the Leased Assets that Sublessor will purchase on behalf of Sublessee, as listed on the attached "Exhibit C". Sublessor hereby specifically reserves in itself the legal title to the Leased Assets at all times until Sublessee has made final payment during the initial Term of this Sublease with respect to rents due under the IER for the Item in question. Sublessee shall not remove the Leased Assets from the Premises without the prior written consent of Sublessor, or until such time as the Item is purchased by Sublessee as provided for herein or is replaced. Sublessor will amortize the Leased Assets inclusive of an annual interest rate equal to six percent (6) % per annum over the initial Term of the Sublease. Upon the earlier of the end of the Initial Term or when all rents owed under the IER for the Item in question is paid for by Sublessee as provided for in the IER, then Sublessor shall sell the Item in question to Sublessee for one dollar ($1.00) and Sublessor shall assign all rights, title and interest in such Item to Sublessee on a lien free basis and shall warrant at that time that such asset is owned solely by Sublessor and is not subject to any liens, claims or encumbrances caused by or consented to by Sublessor and such Item shall no longer be subject to any rental or other obligations herein. At any time, Sublessee may elect to pay off early the balance then due under an IER with respect to an Item based on the payoff amount listed in the IER for such Item (such Item, a **"Purchased Item"**). Such payoff amount, however, shall be discounted to the then net present value (as described on the applicable IER) based on the time

agr1\crosssub3b
August 17, 2011

5

period remaining for the full payoff of such Item utilizing the interest rate specified above in this paragraph. Reference to Leased Assets in this Sublease excludes Purchased Items.

10.   **Condition of Leased Assets**:

10.1.1 **Condition Upon Delivery**.   Sublessee agrees that prior to accepting delivery of the Leased Assets, Sublessee shall fully inspect the Leased Assets to ensure that the Leased Assets are suitable for use by Sublessee.  Sublessee acknowledges and agrees that the Leased Assets are being provided to Sublessee in their present but new condition, "as-is", with all faults, whether known or unknown.  Sublessor hereby warrants and represents that it solely owns the Leased Assets and that such Leased Assets are not subject to any liens, claims or encumbrances. EXCEPT FOR THE EXPRESS WARRANTIES AND REPRESENTATIONS MADE BY SUBLESSOR HEREIN, SUBLESSOR MAKES NO WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO THE LEASED ASSETS, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY EXCLUDED.  SUBLESSEE ASSUMES ALL RISK AND LIABILITY THAT MAY RESULT FROM THE USE OF THE LEASED ASSETS.  However, to the extent Sublessor has rights under warranties relating to the Leased Assets provided by the manufacturer(s) and sellers thereof, Sublessor shall exercise such rights as appropriate in the event of any defect or other failure or problem with the Leased Assets or assign such rights to Sublessee if assignable.

10.1.2 **Condition Upon Return**.  Upon the termination prior to expiration of this Sublease, Sublessee agrees that the Leased Assets (together with all accessories) shall be returned to Sublessor, in the same condition that the Leased Assets and accessories were in when provided to Sublessee, ordinary wear and tear excluded, and except for fixtures that are damaged and that Sublessor is not required to repair under the provisions of the Master Lease (the "Original Condition").  If the Leased Assets and accessories are not returned to Sublessor in their Original Condition, Sublessee shall be responsible, and shall promptly pay Sublessor, for the remaining unamortized value of any Leased Assets (based on its then net present value as described in the IER for the Item in question) that cannot be returned in the Original Condition, or Sublessee may elect to repair such Leased Asset to cause it to be put back to the Original Condition.

10.1.3 **No Liens or Encumbrances**.  Sublessee agrees to maintain the Leased Assets free and clear of any attachment, levy, lien or encumbrance, other than any rights granted to Landlord under the Master Lease, shall promptly notify Sublessor of any such attachment, levy, lien or encumbrance, and agrees to indemnify Sublessor for any loss caused thereby.

10.2   **Use, Risk of Loss**.  Sublessee shall use the Leased Assets solely in accordance with manufacturers' specifications and instructions.  Sublessee shall use the Leased Assets in a proper manner and shall comply with and conform to all federal, state, municipal, and

agr1\crosssub3b
August 17, 2011

6

other laws, ordinances, policies and regulations in any way relating to the possession, use, operation and maintenance of the Leased Assets. Sublessee hereby assumes the risk of loss and damage to the Leased Assets.

        10.3   **Repair and Service; Replacements and Upgrades**. In the event that any of the Leased Assets requires repairs or service, except to the extent of Landlord's obligations with respect to fixtures as provided for in the Master Lease, Sublessee agrees to repair or service the Leased Assets at no cost to Sublessor. Except to the extent of Landlord's obligations under the Master Lease with respect to fixtures, any replacements or upgrades to the Leased Assets shall be furnished by Sublessee at no cost to Sublessor.

        10.4   **Limitation of Remedies**. Sublessor shall not be liable to Sublessee for any interruption in Sublessee's use of the Leased Assets. In no event shall Sublessor be liable for any special, consequential or incidental damages, including without limitation, loss of profits, resulting to Sublessee by reason of any interruption or cessation of production or otherwise, or for any cause whatsoever, including without limitation the negligence of Sublessor or its agents or employees. Sublessee agrees that its sole remedy for any valid claim of Sublessee with respect to the above shall be limited to the refund of any rental theretofore paid to Sublessor.

        10.5   **Inspection by Sublessor**. Sublessor shall have the right to inspect the Leased Assets subject to this Agreement at all reasonable times upon two business days prior written notice for reasonable business purposes and subject to not interfering with the patients or business of Sublessee.

        10.6   **Alterations by Sublessee**. Sublessee may not make any changes, additions, alterations, improvements or additions to the Leased Assets without Sublessor's prior written consent, which Sublessor may give or withhold in its sole discretion.

        10.7   **Personal Property Taxes.** Sublessor shall be responsible for all personal property taxes levied against the Leased Assets, and any furniture or fixtures at the Premises.

      11.   **Telephone and Data Systems; Security.** Sublessee shall be responsible to provide telephones, telephone systems, hardware and software for telephones and data systems, data and other electronic security systems, and shall be responsible for all costs of repairs and replacements thereto.

      12.   **Condition of the Subleased Premises**. Sublessor shall deliver possession of the Premises to Sublessee upon the earlier of (a) substantial completion of the tenant improvements mutually agreed upon between Sublessor and Sublessee, and (b) occupancy by Sublessee. Subject to that requirement, Sublessee will accept the Subleased Premises in the condition specified in the Master Lease and subject to such other related provisions as provided for in the Master Lease such as the obligations of Landlord to complete certain tenant improvements and warranties provided by Landlord. If completion of the tenant improvements and tender of possession of the Premises to Sublessee has not occurred within one hundred eighty (180) days

agr1\crosssub3b
August 17, 2011

7

of the date of this Sublease, this Sublease shall terminate unless other agreements are reached between Sublessor and Sublessee.

13.    **Building Hours and Access; Office Hours of Urgent Care Center**. During the term of this Sublease, Sublessee shall have access to the Premises twenty-four (24) hours per day, seven (7) days per week. Throughout said term, Sublessee shall arrange for the conduct of the Urgent Care Use (as described above) in the Premises in accordance with the hours as specified in the Operating Standards in Exhibit D.

14.    **Operating Standards for the Urgent Care Center.**

14.1    The operating standards for the Urgent Care Center operated at the Premises shall be as set forth in Exhibit D attached hereto and incorporated herein by reference, as such Exhibit may be amended from to time my mutual agreement of the parties.

14.2    Sublessee covenants that each physician who practices medicine at the Urgent Care Center 80 or more hours per month is: (a) duly licensed to practice his/her profession in the State of California, and (b) Board certified or a member of the active medical staff of Hoag Memorial Hospital Presbyterian in full compliance with all of its bylaws, policies, rules and regulations. A breach of this Section 14.2 shall be considered a material breach of this Sublease unless corrected or cured within 30 days of the date that notice of such breach is sent to Sublessee by Sublessor.

15.    **Tenant Improvements**. Except as provided by the Landlord as specified in the Master Lease, Sublessor shall provide or pay for all tenant improvements and fixtures that will become permanent improvements to the Premises, including painting, flooring and ceiling tiles, and for trade fixtures or removable fixtures, furnishings or equipment, as required for the conduct of an urgent care center, as determined by mutual agreement of Sublessor and Sublessee. Sublessor shall submit to Sublessee satisfactory evidence of the expenditures, including copies of invoices. All tenant improvements shall be installed free and clear of any liens or encumbrances.

16.    **Insurance**. During the term of this Sublease, Sublessee shall maintain the insurance coverage required by this Section. Each of the policies shall be issued by a corporate insurer licensed to do business in the State of California, with a current A.M. Best's Rating of A-X or better. All liability policies shall be written on an "occurrence " basis unless such coverage is not available. Each policy shall contain an endorsement requiring written notice to Sublessor within thirty (30) days prior to expiration or termination. Prior to the earlier of any entry onto the Subleased Premises by Sublessee or the Commencement Date, Sublessee shall deliver to Sublessor and Landlord copies of a standard ACORD insurance certificate evidencing the required insurance coverage.

16.1    **Liability Insurance**. Sublessee shall maintain general public liability insurance with combined single limit coverage for personal injury and property damage of at least $3,000,000. Sublessor and Landlord shall be named as additional insureds on this insurance policy.

agr1\crosssub3b
August 17, 2011

8

16.2 **Medical Malpractice Insurance**. Sublessee or its P.C. Subtenant shall maintain a policy of medical malpractice insurance to afford protection of not less than $1,000,000 per occurrence with $3,000,000 aggregate limits of liability for medical malpractice and shall provide Sublessor with written evidence of such coverage in effect.

16.3 **Casualty Insurance**. Only if expressly required to be maintained by Sublessor under the Master Lease, Sublessee shall maintain casualty insurance on the Premises on an all-risk basis, in an amount equal to the replacement cost of the tenant improvements. The insurance policy shall contain waiver of subrogation provisions; provided however, that this waiver shall not apply if the policy of such insurance would be invalidated by the operation of such waiver.

16.4 **Indemnification by Sublessee**. Sublessee agrees to indemnify, defend and save Sublessor and Landlord harmless from all claims (including reasonable costs and expenses of defending against such claims) resulting from (a) any breach by Sublessee of its obligations under this Sublease, or under the Master Lease to the extent of Sublessor's obligations to indemnify Landlord under the Master, Lease; (b) property damage, personal injury or death occurring in or about the Premises during the term of this Sublease, if such damage, injury or death results wholly or in part from the negligent, reckless or willful act or omission of Sublessee or its officers, agents, employees, contractors, subcontractors, customers or invitees. Provided, however, that the foregoing indemnity shall not apply to the extent such claims result from the negligent or willful act or omission of Landlord or Sublessor or Landlord's or Sublessor's officers, agents, employees, contractors or subcontractors.

17.   **Use Of The Subleased Premises**.

17.1 **General Obligation To Comply With Laws**. Sublessee and its P.C. Subtenant shall promptly, and at all times, at its sole cost and expense observe and comply with all laws, statutes, ordinances, rules, regulations, and orders of any duly constituted governmental authority which are now in effect or are hereafter passed, adopted, or promulgated with reference to or which affect the use and, to the extent of Sublessor's obligations under the Master, Lease with respect to the Premises, maintenance of the Premises, or the medical practice being carried on in the Premises. Sublessee and its P.C. Subtenant shall not perform any acts or carry on any practices, or permit the same to be performed or carried on by any other party or permitted user of the Premises, which may injure or be a nuisance or menace to the Premises or the Building or to any adjacent property owner.

17.2 **Storage And Disposal Of Trash**. Sublessee shall at all times keep the Premises clean and free from all medical waste rubbish, trash, and dirt generated by Sublessee or the P.C. Subtenant, at all times, except for storage and removal as permitted herein or in the Master Lease. Sublessee shall store or cause to be stored all waste inside the Building or in trash containment areas around the Building. Sublessee shall, at its sole cost and expense, arrange for the regular pickup of all medical waste, and to the extent provided for in the Master Lease, rubbish, trash, garbage, and other litter with respect to the Premises. Sublessee shall properly

agr1\crosssub3b                                      9
August 17, 2011

store, treat, transport and dispose of all medical waste generated by its activities on the Premises, in the manner required by all applicable federal and state laws, including, without limitation, the California Medical Waste Management Act.

18.    **Estoppel Certificates**. Either party shall, at any time and from time to time, within ten ( 10) days after written request from the other party, execute, acknowledge and deliver to such other party a statement in writing, in a form provided by the first party, certifying that the Sublease of the Premises is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that the Sublease, as so modified, is in full force and effect), and acknowledging that there are no known, uncured defaults on the part of Sublessor or Sublessee under this Sublease, or Sublessor or Landlord under the Master Lease, and that there are no known events or conditions then in existence which, with the passage of time or notice or both, would constitute a default on the part of Sublessor or Sublessee under this Sublease, or Sublessor or Landlord under the Master Lease, or specifying such known defaults, events or conditions, if any are claimed. It is expressly understood that any such statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the Premises. Failure of either party to deliver such statement within such time and continued failure after a further ten (10) days written notice shall, at the option of the other party, constitute a default under this Sublease and, in any event, shall be conclusive against such party that the Sublease is in fact in full force and effect without modification, except as any such modification may be represented by the other party in any certificate prepared by the other party and delivered to the first party for execution pursuant to this Section 18.

19.    **Right of Entry**. Sublessor and its agents or employees may enter upon the Premises at reasonable times upon two days prior written notice to inspect the Premises or for any other reasonable purpose. Sublessor shall coordinate any such inspections with Sublessee so as to minimize the inconvenience to Sublessee, and Sublessor shall not exercise its right of entry in a manner or at a time which interferes with or disrupts Sublessee's use of the Premises, or interferes with any patient's rights or privacy.

20.    **Interruption of Services**. Under no circumstances shall Sublessor be liable to Sublessee, for consequential damages or otherwise, for any failure or interruption of any utility or building service at or upon the Premises, provided, however, that Sublessee may assert claims against the Landlord through Sublessor to the extent provided for in the Master Lease regarding such failure or interruption and Sublessor agrees to promptly cooperate regarding such claims. Sublessor shall not be liable for injury to Sublessee's business or for any loss of income therefrom or for damage to the goods, wares or other property of Sublessee caused by any such failure or interruption.

21.    **Damage to Premises**. Sublessee shall give prompt written notice to Sublessor in the event of any damage to the leasehold improvements or fixtures that occurs in the Premises. Upon such notice, to the extent required under the Master Lease, Sublessor or Landlord, as appropriate, shall promptly repair and restore the leasehold improvements or fixtures so damaged to a condition that is as close as is reasonably possible to the value, condition and character of

agr1\crosssub3b                                    10
August 17, 2011

such leasehold improvements or fixtures immediately prior to such damage pursuant to the terms of the Master Lease. Except for damage to the Premises resulting from a willful, intentional or negligent act of Sublessee, its guests or invitees, payment of the costs and expenses of any such repair and restoration shall be the responsibility of Landlord or Sublessor as provided for in the Master Lease. If the payment of rent by Sublessor is suspended under the Master Lease, then the payment of rent by Sublessee under this Sublease shall be suspended for a similar period of time. If during the term of this Sublease the Master Lease may be terminated at the election of Sublessor as a result of damage to or destruction of the Premises and provided that the Master Lease would not terminate but for Sublessor's election to terminate the Master Lease under the provisions of the Master Lease, then the Sublessor shall not elect to terminate the Master Lease without approval in writing of Sublessee, which approval shall not be unreasonably withheld or delayed, and Sublessor must terminate the Master Lease if permitted and if requested in writing by Sublessee. Although Sublessee is not obligated to do so, to the extent permitted by Sublessor under the Master Lease, Sublessee may elect to repair damages to the Premises or related building so that the Master Lease is not terminated. Notwithstanding any provisions in this Section 21 to the contrary, but without waiving any claims that Sublessee may have against Sublessor with regard to the provisions of this Section 21, this Sublease shall terminate effective as of the effective date of termination of the Master Lease.

22. **Assignment; Subletting.** Notwithstanding anything to the contrary contained in the Master Lease, except as provided for herein, Sublessee shall not be entitled to and shall not sublet, assign, sublet, transfer, mortgage, pledge, hypothecate or encumber this Sublease, or any part or interest thereof, or any right or privilege pertinent thereto, or sublet any portion of the Premises, whether voluntarily, involuntarily or by operation of law (hereinafter collectively referred to as "**Transfer**") without the prior written consent of Sublessor, which consent shall not be unreasonably withheld or delayed, and, in addition, without the prior written consent of Landlord in accordance with the provisions of Article 17 of the Master Lease. Notwithstanding the foregoing, Sublessor acknowledges that Sublessee, in connection with Sublessee's or PC Tenant's business operations, will from time to time permit other physicians to come in and use the Premises, and in that regard, Sublessor hereby consents to Sublessee and PC Tenant permitting other physicians to use the Premises from time to time as may be designated by Sublessee. In assessing whether to give or withhold consent, Sublessor may take into account any relevant matters that in Sublessor's reasonable judgment might affect Sublessor's credit, business reputation or potential liability for the obligations of the lessee under the Master Lease or to third parties, including, without limitation, the creditworthiness and financial strength of the proposed transferee, the creditworthiness and financial strength of Sublessee, the nature of the transferee's business and its proposed use of the relevant portion of the Subleased Premises, and the business reputation of the proposed transferee. For the purposes of this Sublease, the term "Transfer" shall include, but not be limited to, any assignment or any attempted assignment of this Sublease or any rights herein, any total or partial transfer, sale, assignment, lease, sublease, franchise, license, gift, hypothecation, mortgage, pledge, encumbrance, or the entering into any agreement do to any of the foregoing. Any Transfer without Sublessor's prior written consent shall be void ab initio and shall be a material Event of Default under this Sublease. The approval of one Transfer shall not be deemed approval of or consent to any subsequent Transfer.

agr1\crosssub3b                                              11
August 17, 2011

Notwithstanding the foregoing, Sublessor hereby consents to the sublease of the Premises to Hoag Urgent Care Anaheim Hills, Inc., a California professional corporation owned by Robert Amster, M.D.

      22.1   **Transfer Subject to Master Lease**. Any Transfer shall be subject to and governed by the terms of this Sublease and the Master Lease, and after any Transfer approved by Sublessor, Sublessee nonetheless shall remain liable for the full performance of all terms and conditions of this Sublease, including the payment of all Rent and other payments required hereunder.

      22.2   **Change of Ownership or Control**. For the purpose of this Section 22, any single sale, assignment, transfer, or other disposition, or any series (whether or not related) of sales, assignments, transfers, or other dispositions during the term of this Sublease, of any of the issued and outstanding shares or ownership interests in Sublessee, if it results in changing the "ownership" or "control" of Sublessee, shall be construed as a Transfer of this Sublease. "Control" means possession, direct or indirect, of the power to elect or designate fifty-one percent (51%) or more of the governing board, or to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, as a general partner, by contract, or otherwise. "Ownership" means the possession, direct or indirect, of fifty one percent (51%) or more of the equity in Sublessee.

      23.   **Defaults and Remedies**.

      23.1   **Sublessee Defaults**. The occurrence of any of the following events shall constitute a default hereunder by Sublessee:

      23.1.1 The failure by Sublessee to make, when due, any payment of rent as required to be made by Sublessee hereunder, where such failure shall continue for a period of over ten (10) days after written notice thereof by Sublessor to Sublessee, except that if the failure is due to a breach by Hoag Memorial Hospital Presbyterian, a California non-profit public benefit corporation. ("Lender") under that certain line of credit agreement described below, with respect to the advancement of loan proceeds which are budgeted for payments of rent herein or for any other permitted shortfalls, then such failure shall be excused until five (5) days after Lender has cured such breach.

      23.1.2 The abandonment of the Premises by Sublessee. Abandonment is defined to include, but is not limited to, any absence of Sublessee or its sublessee or its representatives from the Premises for at least thirty (30) consecutive days, unless due to a casualty or other similar event that prevents Sublessee from operating the business at the Premises, in accordance with the terms of the Master Lease.

      23.1.3 The failure by Sublessee to observe, perform or comply with any of the covenants, conditions or provisions of this Sublease (other than the payment of rent), where such failure shall continue for a period of at least thirty (30) days after written notice thereof (together with reasonable detail as to the failure) by Sublessor to Sublessee, or such

agr1\crosssub3b
August 17, 2011

12

longer period as may be reasonably necessary to cure the default if the default cannot be reasonably cured within thirty (30) days, or such longer period to cure a non monetary default as provided for in the Master Lease.

23.1.4 The failure by Sublessee to observe, perform or comply with any of the covenants, conditions or provisions of that certain Line of Credit dated November 1, 2010, by and between Sublessor and Sublessee, where such failure shall continue for a period at least thirty (30) days after written notice thereof by Sublessor to Sublessee, Sublessor may, at its option, terminate this Sublease upon written notice to that effect to Sublessee, and the outstanding rent on this Sublease shall become due and payable within sixty (60) days thereof.

23.1.5 The bankruptcy or insolvency of Sublessee or any guarantor of Sublessee's obligations hereunder, or Sublessee or such a guarantor makes a general assignment for the benefit of creditors;

23.1.6 Commencement by Sublessee or any guarantor of Sublessee's obligations hereunder of any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property;

23.1.7 Commencement of any case, proceeding or other action against Sublessee or any guarantor of Sublessee's obligations hereunder seeking to have an order for relief entered against it as debtor, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and such case, proceeding or other action (i) results in the entry of an order for relief against it which is not fully stayed within seven (7) business days after entry thereof or (ii) remains undismissed for a period of sixty (60) days.

23.2  **Sublessor Covenants; Default.**  Sublessor agrees to timely perform all of its obligations under the Master Lease, including, without limitation, the payment of all rent thereunder, and to terminate the Master Lease if requested in writing by Sublessee to the extent that events or facts exist that would permit the Sublessor to terminate the Master Lease; provided, however that so long as Sublessee is not then in default herein, Sublessor may not terminate the Master Lease without the written approval of Sublessee, which approval shall not be unreasonably withheld or delayed, notwithstanding any provisions in the Master Lease or herein to the contrary.

The failure by Sublessor to observe, perform or comply with any of the covenants, conditions or provisions of this Sublease where such failure shall continue for a period of at least thirty (30) days after written notice thereof by Sublessee to Sublessor, or such longer period as may be reasonably necessary to cure the default if the default cannot be

agr1\crosssub3b                                     13
August 17, 2011

reasonably cured within thirty (30) days or a default by Sublessor under the Master Lease which is not cured within the cure periods specified in such Master Lease, unless solely due to a default by Sublessee herein, or a modification of the Master Lease without the written approval of Sublessee except as expressly provided for herein or except as to a permitted assignment of the Master Lease, shall constitute a default hereunder by Sublessor.

     23.3  **Remedies.**  In the event of a default by Sublessee as specified in Section 23.1 above, or in the event of a default by Sublessor as specified in Section 23.2 above, in addition to any other remedies available to either party at law or in equity, Sublessor or Sublessee, as the case may be, shall have the immediate option to terminate this Sublease upon a written notice to the other party to that effect.  Upon the effective date of any termination, Sublessor shall repay to Sublessee any portion of the prior rent payment to covers any time period on or after the effective date of the termination of this Sublease.

     23.4  **Attorney's Fees.**  In the event of an Event of Default by Sublessee, Sublessee will be liable for and will pay Sublessor, in addition to the rents and other sums agreed to be paid hereunder, Sublessor's reasonable attorney's fees incurred in the enforcement of Sublessor's rights under this Sublease.  In the event of any legal action or proceeding between Sublessor and Sublessee, arising out of or in connection with this Sublease, including trial and hearings, appeals and bankruptcy proceedings, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

     23.5  **No Personal Liability of Sublessor.**  Except as provided for in the second sentence of this Section 23.5, the liability of Sublessor to Sublessee for any default by Sublessor under this Sublease shall be limited to the interest of Sublessor in the Premises and the Leased Assets, and Sublessee agrees to look solely to Sublessor's leasehold estate under the Master Lease, Sublessor's interest in the Leased Assets and Sublessor's right to receive Rents under this Sublease, for the recovery of any judgment from the Sublessor, it being intended that Sublessor shall not be personally liable for any judgment or deficiency. Notwithstanding the preceding sentence, Sublessor's shall also be liable for the following and such liability shall not be limited or subject to the preceding sentence: claims against Sublessor for damages arising out of the failure of Sublessor to renew the Master Lease with respect to any renewal options (unless Sublessee was in default herein at the time of such renewal ) or the failure of Sublessor to seek consent or approval of Landlord if such consent or approval may be sought under the Master Lease and provided such failure continues for five (5) days after written notice from Sublessee; Sublessor's acts or omissions that cause a termination of the Master Lease unless due to a default by Sublessee herein, claims to recover reasonable attorneys fees and costs incurred by Sublessee to enforce any provisions herein or in connection with any disputes herein to the extent Sublessee is entitled to such recovery of attorneys fees and costs; and claims arising out of any amendment or modification of the Master Lease that was not consented to in writing by Sublessee, and claims with respect to recovery of damages or relief from or against the Landlord, such as indemnification benefits, to the extent received by Sublessor and not paid over to Sublessee. No provisions in this Section 23.5 herein shall limit or affect the right of Sublessee to

agr1\crosssub3b
August 17, 2011

14

seek and recovery equitable relief against Sublessor, including, without limitation, specific performance.

23.6 **Adverse Impacts**. In the event that the performance by Sublessor or Sublessee of any term, covenant, condition, or provision of this Sublease or in connection with the transactions contemplated thereby shall jeopardize the licensure of Sublessor, Sublessee or the P.C. Subtenant, Sublessor's tax-exempt status or the tax-exempt status of any financing of Sublessor, Sublessor's or the P.C. Subtenant's participation in or reimbursement from Medicare, Medi-Cal, Anthem Blue-Cross, CHAMPUS/TriCare, or other reimbursement or payment programs, or Sublessor's full accreditation by an accrediting agency, or if for any other reason such performance should be in violation of any statute, ordinance, or be otherwise deemed to be illegal or unethical by any recognized body, agency, or association in the medical or hospital fields (each, an "Adverse Impact"), Sublessor and Sublessee shall upon written notice of the existence of such Adverse Impact attempt to negotiate in good faith an amendment to this Sublease or an assignment of the Sublessor's interest in the Master Lease to Sublessee for no consideration and provided Sublessee assumes all obligations of Sublessor under such Master Lease that arise on and after the effective date of such assignment with no continuing liability on the part of Sublessor under the Master Lease, to eliminate any such Adverse Impact, unless the existence of such continuing liability would not constitute or trigger an Adverse Impact. In the event that an amendment or an assignment of the Master Lease to eliminate any such Adverse Impact is not practicable or cannot be agreed upon by the parties in good faith within thirty (30) days of notice of the need thereof, either Sublessor or Sublessee may, at its option, terminate this Sublease upon written notice to that effect to the other party, and the outstanding rent on this Sublease shall become due and payable within thirty (30) days thereof, provided, however, that in any event, Sublessee may elect to cause Sublessor to assign the Master Lease to Sublessee unless Sublessor obtains a legal opinion that such assignment would not eliminate the Adverse Impact as to Sublessor.

24. **Surrender of Premises**. Upon the termination of this Sublease, Sublessee shall surrender possession and restore the Premises to Sublessor, in the same condition as such Premises existed at the commencement of the term of this Sublease, reasonable use and wear only excepted, and except that Sublessee shall not be required to remove any tenant improvements if such items are not required to be removed under the Master Lease. Upon the termination of the Sublease prior to its expiration, all furniture, fixtures and equipment located at the Premises shall be surrendered to Sublessor except for those items with no further rental obligations as specified in the applicable IER and which items shall be deemed sold to Sublessee for one dollar per item, or Sublessee shall be responsible for the replacement thereof or Sublessee may elect to pay the net present value of the balance of the rental payments due with respect to the item in question as specified in the relevant IER (based on the interest rate specified in Section 9 herein) and in such case Sublessee shall be deemed to own such item. Upon the termination of the Sublease on or after its expiration, all furniture, trade removable fixtures and equipment located at the Premises shall be removed by Sublessee, provided that Sublessee shall be responsible for the cost of repairing any damage caused by such removal.

25.    **Intentionally Omitted.**

26.    **Transfers of Sublessor**. Subject to the provisions of the Master Lease, Sublessor shall have the right to transfer and assign to an affiliate of Sublessor, in whole or in part, all its rights and obligations hereunder and in the Premises referred to herein, and in such event and upon such transfer, Sublessor shall be released from any further obligations hereunder, and Sublessee agrees to look solely to such successor in interest of Sublessor for the performance of such obligations. Notwithstanding the preceding sentence, but subject to the Master Lease, Sublessor and any permitted assignee thereto shall not transfer or assign its interest in the Master Lease or this Sublease to a third party (other than an affiliate of Sublessor) and if for any reason Sublessor or its affiliate no longer desires to hold an interest in the Master Lease or this Sublease, or if Sublessor receives an offer to transfer or assign its interest in the Master Lease or this Sublease to a third party (other than an affiliate of Sublessor), then Sublessor shall provide written notice to Sublessee and cause the assignment of the Master Lease to Sublessee for no consideration other than Sublessee's agreement to assume all obligations of Sublessor under the Master Lease that accrue on and after the effective date of such assignment.

27.    **Successors and Assigns**. Each provision hereof shall extend to and shall, as the case may require, bind and inure to the benefit of the Sublessor and its successors and assigns, and of the Sublessee, and its successors and assigns in the event this Sublease has been assigned or subleased with the express, written consent of the Sublessor to the extent such consent is required as provided for herein.

28.    **Entire Agreement**. This Sublease and the exhibit attached hereto constitute the entire contract between the parties hereto and supersede all prior understandings, if any.

29.    **Notices**. All notices which either party is required or may desire to give to the other shall be in writing, and shall be deemed to have been duly given on the date of delivery if delivered in person to the party named below, or three (3) business days after mailing if by certified or registered mail, return receipt requested, postage and postal charges prepaid, addressed as follows:

|  |  |
|---|---|
| Sublessor: | **Newport Healthcare Center LLC**<br>1 Hoag Drive<br>Newport Beach, California 92663<br>Attention: Director, Real Estate |
| Sublessee: | **Your Neighborhood Urgent Care, LLC**<br>18231 Irvine Boulevard, Suite 204<br>Tustin, California 92780<br>Attention: Robert Amster, M.D. and<br>Jennifer Kiindarius, COO |

agr1\crosssub3b                                        16
August 17, 2011

or to such other address(es) or person(s) as may be designated by Sublessor or Sublessee from time to time in accordance with this Section 29.

30.    **Relationship**. In the performance of this Sublease, Sublessor and Sublessee are acting only as lessor and lessee, respectively, and not as partners, joint venturers, or employer-employee, respectively.

31.    **Severability**. If any term or provision of this Sublease, or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Sublease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Sublease shall be valid and enforced to the fullest extent permitted by law.

32.    **Governing Law**. This Sublease and the rights and obligations of the parties hereto are governed by the laws of the State of California.

33.    **Time of Performance**. Except as may be otherwise expressly provided herein, time is of the essence of this Sublease with respect to all required acts of Sublessee.

34.    **Intentionally Omitted.**.

35.    **Access to Books and Records**. Sublessee shall make this Sublease and Sublessee's books, documents and records available to the Secretary of Health and Human Services, the Comptroller General, or their duly authorized representatives as required by law for four (4) years after the termination of this Sublease.

36.    **Counterparts**. This Agreement, and any amendment hereto, may be executed by the parties in separate counterparts, and provided that each party shall have originally executed at least one such counterpart, each such executed counterpart, and any photocopies or facsimile copies thereof, shall be deemed an original, but all such counterparts and any such photocopies and facsimile copies, together shall constitute one and the same instrument, even though all of the parties have not originally executed the same counterparts.

37.    **Binding Nature**. Subject to the provisions contained in this Sublease regarding assignment, this Sublease shall be binding upon and inure to the benefit of the parties and upon their respective successors.

38.    **Additional Documents**. Each of the parties agrees to execute any document or documents that may be requested from time to time by the other party to implement or complete such party's obligations pursuant to this Sublease and to otherwise cooperate fully with such other party in connection with the performance of such party's obligations under this Sublease.

**IN WITNESS WHEREOF**, the parties have executed this Sublease through their duly authorized representatives effective as of the date first written above.

agr1\crosssub3b                                    17
August 17, 2011

SUBLESSOR:                                    SUBLESSEE:

Newport Healthcare Center LLC, a Delaware     Your Neighborhood Urgent Care, LLC,
limited liability company                     a California limited liability company

By:                                           By:
Print:   Sanford Smith                        Print:   Robert Amster, MD
Title:   Sr. Vice President                   Title:   Owner

agr1\crosssub3b                               18
August 17, 2011

# EXHIBIT A

## MASTER LEASE

See attached.

028

EXHIBIT B

THE PREMISES

029



PROPOSED SPACE PLAN 1

URGENT CARE 3,287 SF . PHYSICAL THERAPY + MEDICAL OFFICE 2,928 SF

**SCHEDULE C**

**TERMS AND CONDITIONS OF**

**TRADEMARK LICENSE**

See attached.

## TERMS AND CONDITIONS OF TRADEMARK LICENSE

This Memorandum ("Memorandum") is made effective this 22*ed* day of August, 2011, by and between Hoag Memorial Hospital Presbyterian, a California nonprofit, public benefit corporation with its principal place of business at One Hoag Drive, Newport Beach, California 92658 ("Licensor"), Your Neighborhood Urgent Care, LLC, a California limited liability company with its principal place of business at 6876 Katella Avenue, Cypress, California 90630 ("YNUC"), and Hoag Urgent Care – Anaheim Hills, Inc. a California professional corporation owned by Robert Amster, M.D. which owns and operates an urgent care center in premises located at 5630 Santa Ana Canyon Road, Anaheim, CA and leased by an affiliate of Licensor to YNUC ("P.C.") (YNUC and P.C. are jointly referred to herein as "Licensees"). Licensor and Licensees may be referred to in this Memorandum individually as a "Party" and together as the "Parties."

A. Licensor is the owner of various trademarks which consist of or include the term HOAG, both in word and design form, including but not limited to the marks set forth in Schedules A and B attached hereto and made a part hereof, the accompanying goodwill associated therewith, as well as copyrights to those designs and any variant designs or derivative works;

B. Concurrently with this Memorandum, Licensor and YNUC have entered into that certain sublease to which this Memorandum is attached (the "Sublease") regarding certain premises located in Orange County, California (the "Premises"), and that certain Line of Credit; and

C. YNUC intends to sub-sublease the Premises to P.C., to enable P.C. to conduct an urgent care center in said Premises.

D. Licensees desire to use the marks listed in Schedules A and B hereto (which hereinafter, along with the accompanying goodwill associated therewith, shall be collectively referred to as the "Property" in this Memorandum) in connection with Licensees' urgent care center business at the Premises, subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing Recitals, mutual promises and covenants in this Memorandum and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

1.    Grant:

1.1    Licensor hereby grants Licensees a limited, non-exclusive, non-transferable and revocable license to use only the portion of the Property set forth in Schedule A attached hereto (i) solely as part of the mark and trade name HOAG URGENT CARE CENTER – [practice location] and as part of the corporate name of P.C.; (ii) within the Territory as that term is defined herein, (iii) in connection with a

agr1\crosssub3b
August 17, 2011

21

031

single urgent care center, (iv) limited to providing urgent care and related medical services to patients, and (v) subject to the terms of this Memorandum. The Parties agree that Licensees may use the portion of the Property set forth in Schedule A hereto as the name of Licensees' urgent care center as well as on P.C.'s company letterhead, business cards, website (subject to Section 7c below) and in advertising and promotional materials. For the avoidance of doubt, this license includes use of the mark in the form shown in Schedule C attached hereto.

    1.2    Licensor also hereby grants Licensees a limited, non-exclusive, non-transferable and revocable license to use only the portion of the Property shown in Schedule B attached hereto (i) solely to identify an affiliation between Licensor and Licensees; (ii) within the Territory as that term is defined herein, (iii) in connection with a single urgent care center, (iv) limited to providing urgent care and related medical services to patients, and (v) subject to the terms of this Memorandum. The Parties agree that Licensees may use the design mark shown in Schedule B hereto on P.C.'s company letterhead, business cards and in advertising and promotional materials.

    2.    <u>Territory</u>: The Territory for purposes of this Memorandum shall mean Orange County, California.

    3.    <u>Term</u>: The License granted in this Memorandum ("License") is dependent upon a continuing business relationship between Licensor and YNUC as provided in the Sublease. The License shall continue until or unless terminated by the terms of this Memorandum in accordance with paragraph 4 below.

    4.    Termination:

    Licensor may terminate this Memorandum at any time, in whole or in part, (i) if either of the Licensees materially breaches any of its duties or obligations under this Memorandum and fails to cure such breach within thirty (30) calendar days after written notice detailing the breach is provided by Licensor; (ii) if either of the Licensees materially breaches any duty or obligation under this Memorandum which is not capable of being cured within thirty (30) calendar days after written notice detailing the breach is provided by Licensor; (iii) if Licensees commit numerous breaches of their duties or obligations under this Memorandum which in the aggregate are material and fail to cure such numerous breaches within thirty (30) calendar days after written notice is provided by Licensor; or (iv) in its sole discretion at its convenience upon one hundred and eighty (180) calendar days prior written notice detailing the breach from Licensor, or (v) in its sole discretion at its convenience upon one hundred and eighty (180) calendar days prior written notice from Licensor.

    4.1    Licensees may terminate this Memorandum in whole or in part, upon one hundred and eighty (180) calendar days prior written notice from Licensees, (i) if Licensor materially breaches any of its duties or obligations under this Memorandum and fails to cure such breach within thirty (30) calendar days after written notice is provided

agr1\crosssub3b          22
August 17, 2011

by Licensees; (ii) if Licensor materially breaches any duty or obligation under this Memorandum which is not capable of being cured within thirty (30) calendar days after written notice is provided by Licensees; (iii) if Licensor commits numerous breaches of its duties or obligations under this Memorandum which in the aggregate are material and fails to cure such numerous breaches within thirty (30) calendar days after written notice is provided by Licensees; or (iv) in its sole discretion at its convenience.

4.2     The Parties further agree that termination of either (i) the Sublease Agreement due to an uncured default of Sublessee or (ii) the Letter of Credit due to an uncured default of YNUC thereunder shall terminate the License at the sole discretion of Licensor.

5.     Transition Period:   Immediately upon termination of the License by either Licensor or Licensees as a result of a breach of the Memorandum by the other Party as defined in paragraphs 4(a)(i), (ii) or (iii) or 4(b)(i), (ii) or (iii) above, or if the License is terminated pursuant to paragraphs 4(c) or 4(d) above, the Parties shall automatically enter into a transition period for up to one hundred twenty (120) days, provided that Licensee shall commence the steps outlined in subsections (a) and (b) below within thirty (30) days of the notice of termination, and shall complete such actions within no more than one hundred twenty (120) days after the notice of termination ("Transition Period").  Should either Licensor or Licensees terminate the License without cause by providing one hundred and eighty (180) days written notice pursuant to paragraph 4(a)(iv) or 4(b)(iv) above, the Transition Period will be one hundred and eighty (180) days, beginning with the day the Party provides written notice and ending on the same day the License is terminated.  During the Transition Period, Licensees shall take all reasonable steps necessary to cease all use of the Property and instead transition to use of another mark and trade name with its services which is neither identical or confusingly similar to the Property.  To comply with this paragraph, during the Transition Period (a) P.C. shall promptly (i) discontinue use of the Property as part of its trade name, the name of its urgent care center and as part of any trademark or service mark; and (ii) change its corporate name to another name which does not include the term Hoag or any confusingly similar variant thereto by filing an amendment to its Fictitious Name Permit with the Medical Board of California; and (b) Licensees shall at its sole cost promptly (i) discontinue use of the Property in any signage, forms, stationery, business cards, advertising or promotional materials for their urgent care center at the Premises; (ii) cancel all previously placed orders for products, advertisements or promotions which contain the Property, (iii) surrender to Licensor or destroy depictions of the Property and any physical objects bearing or containing the Property; and (iv) provide written notice to Licensor that it has complied with all requirements set forth herein.

6.     Quality Control:  Licensees agree that any materials which Licensees provide that incorporate the Property shall (i) be of high quality and approved by Licensor, such approval not to be unreasonably withheld; (ii) comply with all federal, state and local laws within the Territory; and (iii) be in strict accordance with Licensor's Corporate Identity Guide, a copy of which has been provided to Licensees and which Licensees hereby acknowledge receipt thereof. Licensees further agree to submit to Licensor, in sufficient time for review and consideration, for

agr1\crosssub3b                    23
August 17, 2011

Licensor's reasonable approval of all proposed materials which include use of the Property or any proposed variants thereof, including, without limitation, the materials listed in paragraph 1 above prior to any use thereof by Licensees. Licensees must have Licensor's written approval from Licensor's Marketing and Corporate Communications Department, not to be unreasonably withheld or delayed, before use of the Property can be made with any materials authorized by the License. Licensor further retains the right and shall inspect all materials bearing the Property with reasonable notice to Licensees to ensure appropriate quality control. Licensor may conduct said inspection either by reviewing publicly available documents or images, or by requesting copies of printed or electronic material bearing the Property from Licensees at any time, which shall be promptly provided to Licensor upon request. Licensees agree not to engage in any advertising or promotional efforts which Licensor reasonably determines to be adverse to Licensor's good will or business. In the event that Licensor determines that the Property has been misused by Licensees in violation of the terms of this Memorandum, Licensor shall inform Licensees of such misuse and allow Licensees an opportunity to promptly cure same within a reasonable period of time after such notice, and if not cured, Licensor may at its sole discretion terminate this Memorandum pursuant to paragraph 5 above.

7.    Ownership of the Property: Licensor represents and warrants that it is the sole and exclusive owner of all rights and interests, including any and all trademark, copyright and other propriety rights, in and to the Property. Licensor further represents and warrants that use of the Property does not violate, infringe or conflict with the rights of any third party.

7.1    Use of the Property, including all related rights and goodwill, shall inure solely to Licensor's benefit. Licensees shall not acquire rights or any other interest in the Property in any form, including but not limited to the forms shown in Schedule B hereto. Notwithstanding any provisions herein to the contrary, however, Licensor shall not acquire any rights or interest in the business or goodwill of Licensees.

7.2    Licensees shall not challenge, attack, or contest the ownership or validity of Licensor's rights in the Property, or Licensor's respective applications or registrations relating to same.

7.3    Licensees shall not apply for, or be the assignee of, any domain name or trademark owned by Licensor or containing the Property, or which would affect any of Licensor's rights in the Property, or aid or abet anyone else in doing so. Licensees shall not register or otherwise acquire any domain names which include the term HOAG. To the extent that Licensees determine that such domain names are necessary for the operation of the business and services referenced herein, Licensor will make reasonable efforts to register such domains and allow Licensees to post website content through those domains, subject to Licensor's review and approval, which shall not be unreasonably withheld. Upon notice of termination of this Memorandum, Licensees shall by the end of the relevant transition period discontinue all use of such domains and relinquish any control Licensee may have over such domains to Licensor.

agr1\crosssub3b
August 17, 2011

24

034

7.4    Licensees shall not commit any act or engage in any conduct which adversely affects the Property or any other trademarks, logos, designs or copyright or copyrightable materials of Licensor or its affiliates.

7.5    This Memorandum shall in no way be construed as an assignment to Licensees of any right, title and/or interest in and to the Property.

8.    Royalty: The royalty payment for the License shall be included in the Rent under the Sublease, which the Parties agree constitutes the fair market value of the above license.

9.    Notices: Licensees shall include appropriate notices of Licensor's trademark and copyright rights to the Property in any and all materials in which Licensees use the Property in accordance with and to the extent expressly provided for in Licensor's Corporate Identity Guide, as amended from time to time and provided to Licensees.

10.    Protection of the Property: Licensor shall be responsible for all expenses and costs related to the protection and registration of the Property. Licensees shall promptly inform Licensor's Marketing and Corporate Communications Department at the address indicated in the notice section herein of any possible infringements, claims or actions pertaining to the Property by any third parties of which it has knowledge or becomes aware, and shall reasonably cooperate with Licensor as provided herein. Licensor shall take any action as it deems necessary or appropriate, in its reasonable judgment, in respect of any possible infringements, claims or actions pertaining to the Property by any third parties. If Licensor does initiate legal proceedings on account of any such infringement claim or action, Licensees agree to reasonably cooperate with and assist Licensor, at Licensor's expense, to the extent reasonably necessary to protect the Property, including without limitation, being joined as a necessary or desirable party to such proceedings, appearing for depositions, meeting with counsel for Licensees, and providing reasonable access to its files relating to the subject matter of the litigation claim or action, and provided that if either of the Licensees is joined as a party to any such action, that Licensor shall provide and pay for legal counsel for Licensees to the extent necessary.

11.    Indemnification:

11.1    Licensor will indemnify, and hold harmless Licensees from and against, any and all claims, damages, litigation, judgments, costs and expenses, including, without limitation, reasonable attorneys fees and costs, arising out of a breach of any of Licensor's obligations under this Memorandum, including Licensor's representations and warranties in Section 7 in connection with Licensees' use of the Property pursuant to the License; provided that Licensees shall promptly notify Licensor in writing upon Licensees' acquiring knowledge of any such claim or suit.

11.2    Licensees will indemnify, and hold harmless Licensor from and against, any and all claims, damages, litigation, judgments, costs and expenses, including, without limitation, reasonable attorneys fees and costs, arising out of a breach of any of Licensees' obligations under this Memorandum,; provided that Licensor shall promptly

agr1\crosssub3b                    25
August 17, 2011

035

notify Licensees in writing upon Licensor's acquiring knowledge of any such claim or suit.

12.   Miscellaneous:

12.1   Notices.   Any notice to be given by any party hereto to the other party in connection with this Memorandum shall be given in writing and shall be transmitted either (i) in person; (ii) by overnight courier or registered mail, postage prepaid, addressed to the receiving Party at the address set forth below, or at such other address of which the sending Party shall have been previously apprised in writing; (iii) by facsimile addressed to such address; or (iv) by e-mail to an e-mail address designated by each Party.   The effective date of any notice shall be the date on which it is actually received by the addressee, except for facsimile notices which shall be effective on the date on which such facsimile is sent provided the sending Party receives a confirmation that the facsimile has been received on that date.

(i)   If to Licensor:

Hoag Memorial Hospital Presbyterian
One Hoag Drive, PO Box 6100
Newport Beach, California   92658-6100
Attention:   Chief Executive Officer and
      Chief Financial Officer

(ii)   If to Licensees:
Your Neighborhood Urgent Care, LLC
18231 Irvine Blvd., Suite 204
Tustin, CA   92780
Attention:   Robert Amster, M.D. and Jennifer Kiindarius, COO

12.2   This Memorandum, including attached Schedules contains the entire agreement of the parties with respect to the Property, and any and all prior agreements relating to the Property are superseded in their entirety.   This Memorandum may be amended only by a writing signed by Licensor and Licensees.

12.3   In any action to enforce the terms of this agreement, the prevailing party shall be entitled to payment by the other party of its reasonable attorneys' fees and costs in connection with such action.

036

IN WITNESS WHEREOF, the parties have executed this Memorandum by their authorized officers.

Hoag Memorial Hospital Presbyterian

By: _____
Sanford Smith

Sr. Vice President

Your Neighborhood Urgent Care, LLC

[Title]

Hoag Urgent Care – Anaheim Hills, Inc.

By: _____
[Name]

President
[Title]

agr1\crosssub3b
August 17, 2011

27

037

## SCHEDULE A

### Licensed Property

HOAG Trademark, as shown in U.S. Trademark Reg. No. 1,977,913

038

**SCHEDULE B**

**[INSERT HOAG DESIGN MARK(S)]**

039

## EXHIBIT C

### INDIVIDUAL EQUIPMENT RECORD FORM

See attached.

040

## INDIVIDUAL EQUIPMENT RECORD FORM


Description of Equipment:_____

_____


Serial Number of Equipment (if applicable) :_____


| Monthly Rental installment Amount* | Monthly Rental Amount | Payoff |
|---|---|---|
| 1 | $_____ | $_____ |
| 2 | $_____ | $_____ |
| 3 | $_____ | $_____ |
| 4 $_____ | $_____ | |
| etc. | etc. | etc. |

*as described in Section 9 of the attached Sublease: the payoff amount is the net present value of the remaining Monthly Rental Amounts due under this IER as specified above determined by discounting such remaining payments at a discount rate equal to 6% as specified in Section 9 of the attached Sublease.

041

**SUBLESSOR:**                          **SUBLESSEE:**

Newport Healthcare Center, LLC, a Delaware    Your Neighborhood Urgent Care, LLC,
limited liability company                     a California limited liability company

By: _____                   By: _____
Print: SANFORD SMITH                     Print: Robert Amster, MD
Title: SR. VICE PRESIDENT                Title: president


[The provisions herein shall be as mutually agreed to in writing by Sublessor and
Sublessee from time to time with respect to Leased Assets.]


agr1\crosssub3b                          32
August 17, 2011

**EXHIBIT D**

**OPERATING STANDARDS**

See attached.

043

## HOAG URGENT CARE NETWORK OPERATING STANDARDS

Site Standards:

Minimum Hours: Monday through Friday 10am-5pm

No appointment necessary

Physician on-site at all times

ACLS Certified, Board Certified physicians

BCLS/Heartsaver Certified staff


Services Offered:

Adult and Pediatric Surgical/Trauma Services

      Laceration Repair

      Fracture Management

      Incision and Draining of Abscesses

      Skin Lesion Removal

      Minor Burn Management

Medical Illness Management (Diagnosis and Treatment)

Employment/Sports/Camp/School Physicals

IV Hydration

Work Injury Management

On-Site Pharmacy with narcotic dispensing tracking system

Injectables Management


On-site Laboratory/ X-Ray Services:

Digital X – Rays performed by licensed Limited X-Ray techs, some of whom may have skull certification. All can perform spinal x-rays.

Urinalysis

Drug Screening Collections performed in secure bathroom

Hemoglobin Testing

Strep, Mononucleosis, Influenza Tests

Draw Station

Blood glucose

On-site Equipment:

Digital X-Ray. All x-rays are over-read within 24-48 hours by a board certified radiologist

EKG performed via a self interpreting machine

Slit Lamp, Schiotz tonometer

Audiometer

AED

ACLS Crash Cart

Quality and Service Indicators:

Wait times until seen by Physician

Overall patient experience

Patient Departures prior to being seen

Revisits with same diagnosis related to first visit within 1 week

Number of missed x-ray/lab diagnoses

agr1\crosssub3b                                        35
August 17, 2011

Results of labs and X-Rays tracking

Physician call backs to patients within same day

Submission of discharge sheet and follow-up instructions

All medical charts will be sent to PMD of record if known

Electronic Medical Record Capability:

EMR system should be capable of integrating with HOAG Health Information Exchange
(HIE) system. Requires HL-7 interface capability.

Practice Management System:

PM system should bill electronically and receive electronic remittances. EMR and PM
systems should be integrated together.

Notwithstanding the above, no pharmaceuticals may be sold at the Premises.

# EXHIBIT B

## SUBLEASE AGREEMENT

THIS SUBLEASE AGREEMENT (the "Sublease") is made and entered into as of the 23rd day of June, 2011, by and between **Newport Healthcare Center LLC**, a Delaware limited liability company ("Sublessor") and **Your Neighborhood Urgent Care, LLC**, a California limited liability company ("Sublessee").

### RECITALS

A.    Sublessor leases certain office space located at 5355 Warner Avenue, Suite 102, Huntington Beach, California (the "Premises"), pursuant to the Lease dated June 1, 2011, by and between Kim Family HB, LLC ("Landlord"), and Newport Health Care Center LLC as Lessee; ("the Master Lease"). A copy of the Master Lease is attached to this Sublease as Exhibit "A", which is incorporated by this reference.

B.    Sublessor desires to sublease the Premises to Sublessee, including all leasehold improvements and trade fixtures located in the Premises, and Sublessee desires to sublease the Premises from Sublessor pursuant to the terms and conditions contained in this Sublease.

C.    Sublessee intends to concurrently herewith sublease the Premises to a California professional corporation that will own and operate an urgent care center at the Premises ("P.C. Subtenant"), as evidenced by a sublease between Sublessee and PC Subtenant to be executed concurrently herewith (the "PC Sublease").

D.    Sublessor shall concurrently with the execution of the Master Lease cause the Landlord to execute a consent to this Sublease and a consent to the PC Sublease in a form acceptable to Sublessee and Sublessor (the "Landlord Consent") and in accordance with the provisions herein.

**NOW, THEREFORE,** in consideration of the above recitals, the terms and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Creation of Sublease.**  Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor the Premises. Sublessee shall use and occupy the Premises in accordance with the terms and conditions contained in this Sublease.

2.    **Acceptance of Premises.**  The commencement of the use and occupancy of the Premises by Sublessee shall conclusively constitute an agreement by Sublessee that the Premises is acceptable to the extent that Sublessor accepts the Premises under the provisions of the Master Lease.

3.    **Term.**  The term of this Sublease shall commence on the earlier of November 1, 2011 or the date of Commencement of the Master Lease (the "Commencement Date"), and shall continue thereafter until the expiration of the term (or extended term) of the Master Lease on October 31, 2021.  If Sublessor extends the term of the Master Lease beyond June 5, 2021) [(the Master Lease contains two five (5) year renewal option)], or if Sublessee elects to extend the

1

term of the Master Lease as provided for herein then Sublessee shall have the right to extend this Sublease for a like period of time, except that this Sublease term shall be extended by the time period that Sublessee extends the Master Lease. In no event shall the term of this Sublease extend beyond the end of the term of the Master Lease, plus renewal terms to the extent exercised. In addition, this Sublease shall immediately terminate effective as of the expiration without renewal or the earlier termination of the Master Lease. If for any reason Sublessor does not timely renew the Master Lease with respect to any available option to extend in accordance with the provisions of the Master Lease and provide a copy of such written notice to Sublessee at the time the notice to renew is sent to Landlord and provided Sublessee is not then in default herein, Sublessee may extend the term of the Master Lease on behalf of the Sublessor in accordance with the provisions of the Master Lease, and Sublessor will not send contrary instructions to Landlord. Sublessor agrees as follows and agrees to incorporate these provisions in the Landlord Consent: (a) Sublessor agrees to exercise its option under the Master Lease to renew or extend the term of the Master Lease within five days of written request by Sublessee; (b) not to extend the term of the Master Lease or any further extensions without the prior written approval of Sublessee in the Sublessee's sole discretion; (c) to cause the Landlord to agree under the provisions of the Landlord Consent to permit Sublessee to exercise the options to renew under the Master Lease notwithstanding any contrary instructions from Sublessor and to also provide in such Landlord Consent that a copy of all notices sent by any party under the Master Lease shall also be sent to Sublessee at the address specified herein.

4.    **Rent.**

4.1    **Monthly Base Rent.** Sublessee shall pay to Sublessor, as monthly base rent for the Premises, without deduction, offset, prior notice or demand (except as expressly otherwise provided in this Sublease), an amount equal to Three Dollars-and-Thirty-eight-Cents per square foot per month or Eight Thousand Nine Hundred Seventy-seven Dollars and Twenty-eight Cents ($8,977.28) per month ("Monthly Base Rent"). Monthly Base Rent is based upon a valuation by a qualified appraiser (paid for solely by Sublessor), including an opinion as to fair market value of the rental of the Premises, taking into account the per month rental under the Master Lease and the costs incurred by Sublessor to build out the Premises. Rent shall be due on or before the first (1st) day of each month during the term of this Sublease, commencing on the fifth month of the term of this Sublease. Rent for any period during the term of this Sublease which is for less than one (1) month shall be a prorated based upon a thirty (30) day month. Rent shall be paid to Sublessor at its address for notice or to such other person or address as Sublessor will from time to time designate in writing. Sublessee agrees to pay Sublessor a late charge of five percent (5%) of the amount of rent which is not paid within five (5) days of that rent's due date. Notwithstanding any provisions herein to the contrary, the Monthly Base Rent and all other Additional Rent shall be abated to the extent and on a dollar for dollar basis that such rents are abated for any reason under the Master Lease, excluding any free rent at the inception of the Master Lease, but including, without limitation, any rents that are subject to abatement or offset due to interruption of services, or with respect to early possession, casualty or condemnation events or otherwise, as expressly provided for in the Master Lease. Sublessor shall offset as credit against future rents owed herein any monies received from Landlord that relate to rents or Additional Rent under the Master Lease.

2

4.2    **Base Rent Adjustments**.  In accordance with the Master Lease, the portion of the Monthly Base Rent that is defined as the "Monthly Base Rent" under the Master Lease shall be increased on the same percentage basis that such rent is increased for any reason under the Master Lease.

4.3    **Additional Rent**.

4.3.1    Master Lease Amounts.  In addition to the Monthly Base Rent, throughout the term of this Sublease, Sublessee shall also be responsible for payment of any other sums due and payable by Sublessor under the Master Lease (which amounts, if any, are referred to in this Sublease as "Additional Rent").  All such Additional Rent shall be due and payable within ten (10) days after notice from Sublessor that the Additional Rent is due, provided Sublessor also sends with such notice any written documentation it receives from the Landlord with respect to such Additional Rent. The term "Rent" as used in this Sublease shall mean the Monthly Base Rent and all Additional Rent.

4.3.2    Master Lease Common Area Expenses.  The parties agree that the Monthly Base Rent payable under this Sublease shall be on a "triple net lease" basis, and therefore, in addition to the Monthly Base Rent described in Section 4.1 above, to the extent expressly provided for in the Master Lease, Sublessee shall be responsible commencing November 1, 2011, for its pro rata share of all common area (interior and exterior) maintenance charges, operating costs and any and all other building expenses that are passed through from, or charged by, the Landlord to Sublessor pursuant to the Master Lease.  In addition, to the extent expressly provided for in the Master Lease, Sublessee shall be solely responsible for all operating and maintenance costs associated with maintaining the Premises, including without limitation commercial general public liability insurance covering the Premises, professional liability insurance covering the professional services rendered in the Premises, fire and extended insurance coverage, utility costs and expenses at the Premises, including all water, electricity, gas, heat and telephone charges, ordinary repairs, utilities, janitorial and waste removal services, and any personal property taxes and assessments charged on the use or occupancy of the Premises.  By way of clarification, Sublessee shall not be responsible for any of the items listed or described in this Section 4.3.2 if not payable by Sublessor under the express provisions of the Master Lease.

4.3.3    Lease of Leased Assets.  In addition to the Monthly Base Rent, throughout the term of this Sublease, Sublessee shall also pay to Sublessor any monthly amounts due for the total monthly rent reflected in the IERs for the Leased Assets (as both terms are defined in Section 7 below), and, as provided for herein or in the IER described herein, such amounts may be reduced to zero on or before the end of the initial term of the Sublease.  The amounts are based upon an installment sale of certain of the Leased Assets as described in Section 9 below.

4.3.4    Trademark License.  In addition to the Monthly Base Rent, throughout the term of the Sublease during the term of the Trademark License attached hereto as Exhibit B, Sublessee shall also pay to Sublessor a royalty equal to one percent (1%) of the Net Patient Revenue from the Premises (as herinafter defined), payable quarterly onor before the last day of each month following the end of each calendar quarter (e.g., for the calendar quarter

3

ending December 31, payable on the last day of January). For purposes of this Agreement, "New Patient Revenue" means the total revenue received by P.C. Subtenant (as defined here) in consideration of services provided by P.C. Subtenant to patients of P.C. Subtenant, net of contractual allowances and adjustments.

     5.     **Master Lease**.

     5.1    **Subject to the Master Lease.** Prior to the occupancy of the Premises, Sublessee shall first familiarize itself with all of the terms and conditions contained in the Master Lease. This Sublease is subordinate to the Master Lease and is subject to all of the terms and conditions of the Master Lease.

     5.2    **Incorporated Provisions of the Master Lease**. Except for the payment of rent, additional rent or any other amounts under the Master Lease directly to Landlord, all of the provisions of the Master Lease are hereby incorporated into this Sublease by this reference. In this regard, any rights that Landlord may have against Sublessor pursuant to the Master Lease, Sublessor shall hereby have equivalent rights against Sublessee pursuant to this Sublease, and any rights which Sublessor may have against Landlord under the Master Lease, Sublessee shall have equivalent rights against Sublessor. Should an express provision of this Sublease conflict with the Master Lease, then the express provision of this Sublease shall govern as between Sublessor and Sublessee. Sublessee may exercise any rights against Landlord under the Master Lease in the name of the Sublessor to the extent Sublessor fails to timely exercise any rights under the Master Lease, or if Sublessor fails to exercise any rights of Sublessor under the Master Lease promptly upon written notice from Sublessee, and Sublessor agrees to reasonably cooperate with Sublessee in connection with all such actions by Sublessee, including, without limitation, the execution of any agreement or consent that is reasonably necessary in order for Sublessee to exercise Sublessor's rights under the Master Lease, and further, Sublessor hereby grants a limited power of appointment coupled with an interest to Sublessee to exercise such rights of Sublessor under the Master Lease provided Sublessee is not then in default hereunder. Reference to default of Sublessee under this Agreement means that Sublessee has breached its obligations herein and such breach was not cured within the cure period provided for herein or in the Master Lease as applicable. Such rights that Sublessee may exercise under the Master Lease, include, without limitation, the right to seek indemnification from Landlord, contest any pass through expenses and to conduct audits of such costs. Sublessee shall pay for the costs incurred to exercise such rights of Sublessor provided that Sublessee shall retain all benefits arising out of such exercise of rights such as any refunds of overcharges for pass through of common area operating costs.

     5.3    **No Breach of Master Lease; Indemnification.** While this Sublease is in effect, Sublessee shall not do anything on or about the Premises which would constitute a breach of the Master Lease, and Sublessee hereby indemnifies Sublessor for any and all costs and expenses, including, without limitation, reasonable attorney fees, incurred by Sublessor against Landlord for any action or activity of Sublessee (or Sublessee's employees, agents or invitees) which would constitute a breach of the Master Lease. In the event that Sublessee holds over its occupation of the Premises after the termination of the Master Lease, Sublessee shall be solely responsible for all obligations under the Master Lease, and Sublessee hereby indemnifies

4

Sublessor for any and all costs and expenses, including, without limitation, reasonable attorney fees, incurred by Sublessor for Sublessee's holding over its occupancy of the Premises.

      5.4    **Excluded Provisions of the Master Lease**. Notwithstanding Sections 5.1 through 5.3 above, the following provisions of the Master Lease are excluded from this Sublease: 1.5, 1.9(a), 1.9(f), 13.4, 13.5, 51AIII, 61.

      5.5    **Right to Cure Defaults**. In the event that Sublessee receives notice of a default under the Master Lease, not caused by any default by Sublessee under this Sublease, and provided that Sublessee is not then in default under this Sublease, then Sublessee will have the right, but not the obligation, to cure the default under the Master Lease. Sublessee's right to cure includes the right to pay rent and other amounts due under the Master Lease directly to Landlord, on Sublessor's behalf, and to offset the amounts so paid to Landlord against future rent due and payable under this Sublease, or, assuming no monies are then owed to Sublessor by Sublessee herein, to demand immediate payment from Sublessor if the amount paid by Sublessee exceeds one month of Monthly Base Rent herein. Sublessor shall cause the Landlord Consent to include the right of Sublessee to cure any defaults under the Master Lease after five days written notice from Landlord and to require Landlord to give copies of all notices under the Master Lease to Sublessee at the time that notices are given or required to be given to Sublessor, and that notice to Sublessor shall not be effective unless such notice is also given to Sublessee.

    6.    **Exclusive and Permitted Use of Premises**. During the term of this Sublease, Sublessee shall have the exclusive right to use of the Premises as an urgent care center or as otherwise consented to by Sublessor and permitted under the Master Lease. Except as otherwise set forth in this Sublease, and only to the extent of Sublessor's obligations under the Master Lease, Sublessee shall maintain, repair and keep in good condition the Premises, including without limitation any and all leasehold improvements and fixtures contained therein. In addition, Sublessee may not conduct any use that would cause Sublessor to be in violation of any term or condition of the Master Lease.

    7.    **Maintenance and Repair.** Sublessee, at Sublessee's sole cost and expense, shall keep the Premises, and the "Leased Assets" which shall include all fixtures, trade equipment, trade fixtures, furniture, and other personal property leased to Sublessee pursuant to this Sublease in good condition and repair and in compliance with all applicable laws. Each item ("Item") of Leased Assets is listed on a separate Individual Equipment Record attached hereto as Exhibit C (each an "Individual Equipment Record" or "IER") and the rents due (which are part of the Monthly Base Rent) with respect to such Item are specified therein. Sublessor shall not be responsible to make any repairs or maintenance to the Premises or the Leased Assets. Sublessee shall be responsible for any replacements due to failure, unless damage or such failure is caused by the act, omission, or active negligence, of Sublessor and/or its agents, employees. The Premises shall at all times be kept clean, safe and sanitary and, to the extent of Sublessor's obligations under the Master Lease, in good order, condition, replacement and repair by Sublessee.

    8.    **Trademark and License.** During the term of this Sublease, Sublessee and its P.C. Subtenant shall have a limited, non-exclusive, non-transferable and revocable license to use name "Hoag" in connection with the conduct of the urgent care center business on the Premises,

5

subject to the terms and conditions of the Trademark and License by and among Sublessor, Sublessee and P.C. Subtenant, in the form attached hereto as Schedule C.

9.    **Lease of Leased Assets** Sublessor hereby leases to Sublessee the Leased Assets that Sublessor will purchase on behalf of Sublessee, as listed on the attached "Exhibit C". Sublessor hereby specifically reserves in itself the legal title to the Leased Assets at all times until Sublessee has made final payment during the initial Term of this Sublease with respect to rents due under the IER for the Item in question. Sublessee shall not remove the Leased Assets from the Premises without the prior written consent of Sublessor, or until such time as the Item is purchased by Sublessee as provided for herein or is replaced. Sublessor will amortize the Leased Assets inclusive of an annual interest rate equal to six percent (6) % per annum over the initial Term of the Sublease. Upon the earlier of the end of the Initial Term or when all rents owed under the IER for the Item in question is paid for by Sublessee as provided for in the IER, then Sublessor shall sell the Item in question to Sublessee for one dollar ($1.00) and Sublessor shall assign all rights, title and interest in such Item to Sublessee on a lien free basis and shall warrant at that time that such asset is owned solely by Sublessor and is not subject to any liens, claims or encumbrances caused by or consented to by Sublessor and such Item shall no longer be subject to any rental or other obligations herein. At any time, Sublessee may elect to pay off early the balance then due under an IER with respect to an Item based on the payoff amount listed in the IER for such Item (such Item, a "Purchased Item"). Such payoff amount, however, shall be discounted to the then net present value (as described in Section 24 herein) based on the time period remaining for the full payoff of such Item utilizing the interest rate specified above in this paragraph. Reference to Leased Assets in this Sublease excludes Purchased Items.

10.    **Condition of Leased Assets:**

10.1.1 **Condition Upon Delivery.**    Sublessee agrees that prior to accepting delivery of the Leased Assets, Sublessee shall fully inspect the Leased Assets to ensure that the Leased Assets are suitable for use by Sublessee. Sublessee acknowledges and agrees that the Leased Assets are being provided to Sublessee in their present but new condition, "as-is", with all faults, whether known or unknown. Sublessor hereby warrants and represents that it solely owns the Leased Assets and that such Leased Assets are not subject to any liens, claims or encumbrances. EXCEPT FOR THE EXPRESS WARRANTIES AND REPRESENTATIONS MADE BY SUBLESSOR HEREIN, SUBLESSOR MAKES NO WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO THE LEASED ASSETS, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY EXCLUDED. SUBLESSEE ASSUMES ALL RISK AND LIABILITY THAT MAY RESULT FROM THE USE OF THE LEASED ASSETS. However, to the extent Sublessor has rights under warranties relating to the Leased Assets provided by the manufacturer(s) and sellers thereof, Sublessor shall exercise such rights as appropriate in the event of any defect or other failure or problem with the Leased Assets or assign such rights to Sublessee if assignable.

10.1.2 **Condition Upon Return**. Upon the termination prior to expiration of this Sublease, Sublessee agrees that the Leased Assets (together with all accessories) shall be returned to Sublessor, in the same condition that the Leased Assets and accessories were in when

6

provided to Sublessee, ordinary wear and tear excluded, and except for fixtures that are damaged and that Sublessor is not required to repair under the provisions of the Master Lease (the "Original Condition"). If the Leased Assets and accessories are not returned to Sublessor in their Original Condition, Sublessee shall be responsible, and shall promptly pay Sublessor, for the remaining unamortized value of any Leased Assets (based on its then net present value as described in the IER for the Item in question) that cannot be returned in the Original Condition, or Sublessee may elect to repair such Leased Asset to cause it to be put back to the Original Condition.

10.1.3 **No Liens or Encumbrances**. Sublessee agrees to maintain the Leased Assets free and clear of any attachment, levy, lien or encumbrance, other than any rights granted to Landlord under the Master Lease, shall promptly notify Sublessor of any such attachment, levy, lien or encumbrance, and agrees to indemnify Sublessor for any loss caused thereby.

10.2 **Use, Risk of Loss**. Sublessee shall use the Leased Assets solely in accordance with manufacturers' specifications and instructions. Sublessee shall use the Leased Assets in a proper manner and shall comply with and conform to all federal, state, municipal, and other laws, ordinances, policies and regulations in any way relating to the possession, use, operation and maintenance of the Leased Assets. Sublessee hereby assumes the risk of loss and damage to the Leased Assets.

10.3 **Repair and Service; Replacements and Upgrades**. In the event that any of the Leased Assets requires repairs or service, except to the extent of Landlord's obligations with respect to fixtures as provided for in the Master Lease, Sublessee agrees to repair or service the Leased Assets at no cost to Sublessor. Except to the extent of Landlord's obligations under the Master Lease with respect to fixtures, any replacements or upgrades to the Leased Assets shall be furnished by Sublessee at no cost to Sublessor.

10.4 **Limitation of Remedies**. Sublessor shall not be liable to Sublessee for any interruption in Sublessee's use of the Leased Assets. In no event shall Sublessor be liable for any special, consequential or incidental damages, including without limitation, loss of profits, resulting to Sublessee by reason of any interruption or cessation of production or otherwise, or for any cause whatsoever, including without limitation the negligence of Sublessor or its agents or employees. Sublessee agrees that its sole remedy for any valid claim of Sublessee with respect to the above shall be limited to the refund of any rental theretofore paid to Sublessor.

10.5 **Inspection by Sublessor**. Sublessor shall have the right to inspect the Leased Assets subject to this Agreement at all reasonable times upon two business days prior written notice for reasonable business purposes and subject to not interfering with the patients or business of Sublessee.

10.6 **Alterations by Sublessee**. Sublessee may not make any changes, additions, alterations, improvements or additions to the Leased Assets without Sublessor's prior written consent, which Sublessor may give or withhold in its sole discretion.

7

10.7    **Personal Property Taxes.** Sublessor shall be responsible for all personal property taxes levied against the Leased Assets, and any furniture or fixtures at the Premises.

11.    **Telephone and Data Systems; Security.** Sublessee shall be responsible to provide telephones, telephone systems, hardware and software for telephones and data systems, data and other electronic security systems, and shall be responsible for all costs of repairs and replacements thereto.

12.    **Condition of the Subleased Premises**. Sublessor shall deliver possession of the Premises to Sublessee upon the earlier of (a) substantial completion of the tenant improvements mutually agreed upon between Sublessor and Sublessee, and (b) occupancy by Sublessee. Subject to that requirement, Sublessee will accept the Subleased Premises in the condition specified in the Master Lease and subject to such other related provisions as provided for in the Master Lease such as the obligations of Landlord to complete certain tenant improvements and warranties provided by Landlord. If completion of the tenant improvements and possession of the Premises by Sublessee has not occurred within one hundred eighty (180) days of the date of this Sublease, this Sublease shall terminate unless other agreements are reached between Sublessor and Sublessee.

13.    **Building Hours and Access; Office Hours of Urgent Care Center**. During the term of this Sublease, Sublessee shall have access to the Building twenty-four (24) hours per day, seven (7) days per week. Throughout said term, Sublessee shall arrange for the conduct of the practice of an urgent care center in the Premises in accordance with the hours as specified in the Operating Standards in Exhibit D.

14.    **Operating Standards for the Urgent Care Center.**

14.1    The operating standards for the Urgent Care Center operated at the Premises shall be as set forth in Exhibit D attached hereto and incorporated herein by reference, as such Exhibit may be amended from to time my mutual agreement of the parties.

14.2    Sublessee covenants that each physician who practices medicine at the Urgent Care Center 80 or more hours per month is: (a) duly licensed to practice his/her profession in the State of California, and (b) Board certified or a member of the active medical staff of Hoag Memorial Hospital Presbyterian in full compliance with all of its bylaws, policies, rules and regulations. A breach of this Section 14.2 shall be considered a material breach of this Sublease.

15.    **Tenant Improvements**. Except as provided by the Landlord as specified in the Master Lease, Sublessor shall provide or pay for all tenant improvements and fixtures that will become permanent improvements to the Premises, including painting, flooring and ceiling tiles, and for trade fixtures or removable fixtures, furnishings or equipment, as required for the conduct of an urgent care center, as determined by mutual agreement of Sublessor and Sublessee. Sublessor shall submit to Sublessee satisfactory evidence of the expenditures, including copies of invoices. All tenant improvements shall be installed free and clear of any liens or encumbrances.

16.    **Insurance**. During the term of this Sublease, Sublessee shall maintain the insurance coverage required by this Section. Each of the policies shall be issued by a corporate

8

insurer licensed to do business in the State of California, with a current A.M. Best's Rating of A-VII or better. All liability policies shall be written on a "claims made" basis unless such coverage is not available. Each policy shall contain an endorsement requiring written notice to Sublessor within thirty (30) days prior to expiration or termination. Prior to the earlier of any entry onto the Subleased Premises by Sublessee or the Commencement Date, Sublessee shall deliver to Sublessor and Landlord copies of a standard ACORD insurance certificate evidencing the required insurance coverage.

      16.1   **Liability Insurance**.  Sublessee shall maintain general public liability insurance with combined single limit coverage for personal injury and property damage of at least $3,000,000. Sublessor and Landlord shall be named as additional insureds on this insurance policy.

      16.2   **Medical Malpractice Insurance**.  Sublessee or its P.C. Subtenant shall maintain a policy of medical malpractice insurance to afford protection of not less than $1,000,000 per occurrence with $3,000,000 aggregate limits of liability for medical malpractice and shall provide Sublessor with written evidence of such coverage in effect.

      16.3   **Casualty Insurance**.  Only if expressly required to be maintained by Sublessor under the Master Lease, Sublessee shall maintain casualty insurance on the Premises on an all-risk basis, in an amount equal to the replacement cost of the tenant improvements. The insurance policy shall contain waiver of subrogation provisions; provided however, that this waiver shall not apply if the policy of such insurance would be invalidated by the operation of such waiver.

      16.4   **Indemnification by Sublessee**.  Sublessee agrees to indemnify, defend and save Sublessor and Landlord harmless from all claims (including reasonable costs and expenses of defending against such claims) resulting from (a) any breach by Sublessee of its obligations under this Sublease, or under the Master Lease to the extent of Sublessor's obligations to indemnify Landlord under the Master, Lease; (b) property damage, personal injury or death occurring in or about the Premises during the term of this Sublease, if such damage, injury or death results wholly or in part from the negligent, reckless or willful act or omission of Sublessee or its officers, agents, employees, contractors, subcontractors, customers or invitees. Provided, however, that the foregoing indemnity shall not apply to the extent such claims result from the negligent or willful act or omission of Landlord or Sublessor or Landlord's or Sublessor's officers, agents, employees, contractors or subcontractors.

17.   **Use Of The Subleased Premises**.

      17.1   **General Obligation To Comply With Laws**.  Sublessee and its P.C. Subtenant shall promptly, and at all times, at its sole cost and expense observe and comply with all laws, statutes, ordinances, rules, regulations, and orders of any duly constituted governmental authority which are now in effect or are hereafter passed, adopted, or promulgated with reference to or which affect the use and, to the extent of Sublessor's obligations under the Master, Lease, maintenance of the Premises, or the medical practice being carried on in the Premises. Sublessee and its P.C. Subtenant shall not perform any acts or carry on any practices, or permit the same to be performed or carried on by any other party or permitted user of the Subleased Premises,

9

which may injure or be a nuisance or menace to the Premises or the Building or to any adjacent property owner.

      17.2  **Storage And Disposal Of Trash**.  Sublessee shall at all times keep the Building, the walkways serving the Building and the Premises and service area, and all other parts of the Building and the Premises clean and free from all medical waste rubbish, trash, and dirt generated by Sublessee or the P.C., at all times, except for storage and removal as permitted herein or in the Master Lease.  Sublessee shall store or cause to be stored all waste inside the Building or in trash containment areas around the Building.  Sublessee shall, at its sole cost and expense, arrange for the regular pickup of all medical waste, and to the extent provided for in the Master Lease, rubbish, trash, garbage, and other litter.  Sublessee shall properly store, treat, transport and dispose of all medical waste generated by its activities on the Premises, in the manner required by all applicable federal and state laws, including, without limitation, the California Medical Waste Management Act.

      18.  **Estoppel Certificates**.  Either party shall, at any time and from time to time, within ten ( 10) days after written request from the other party, execute, acknowledge and deliver to such other party a statement in writing, in a form provided by the first party, certifying that the Sublease of the Premises is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that the Sublease, as so modified, is in full force and effect), and acknowledging that there are no known, uncured defaults on the part of Sublessor or Sublessee under this Sublease, or Sublessor or Landlord under the Master Lease, and that there are no known events or conditions then in existence which, with the passage of time or notice or both, would constitute a default on the part of Sublessor or Sublessee under this Sublease, or Sublessor or Landlord under the Master Lease, or specifying such known defaults, events or conditions, if any are claimed.  It is expressly understood that any such statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the Premises.  Failure of either party to deliver such statement within such time and continued failure after a further ten (10) days written notice shall, at the option of the other party, constitute a default under this Sublease and, in any event, shall be conclusive against such party that the Sublease is in fact in full force and effect without modification, except as any such modification may be represented by the other party in any certificate prepared by the other party and delivered to the first party for execution pursuant to this Section 18.

      19.  **Right of Entry**.  Sublessor and its agents or employees may enter upon the Premises at reasonable times upon two days prior written notice to inspect the Premises or for any other reasonable purpose.  Sublessor shall coordinate any such inspections with Sublessee so as to minimize the inconvenience to Sublessee, and Sublessor shall not exercise its right of entry in a manner or at a time which interferes with or disrupts Sublessee's use of the Premises, or interferes with any patient's rights or privacy.

      20.  **Interruption of Services**.  Under no circumstances shall Sublessor be liable to Sublessee, for consequential damages or otherwise, for any failure or interruption of any utility or building service at or upon the Premises, provided, however, that Sublessee may assert claims against the Landlord through Sublessor to the extent provided for in the Master Lease regarding such failure or interruption and Sublessor agrees to promptly cooperate regarding such claims.  Sublessor shall not be liable for injury to Sublessee's business or for any loss of income

10

therefrom or for damage to the goods, wares or other property of Sublessee caused by any such failure or interruption. Notwithstanding any waiver of claims or rights against Sublessor, Sublessee shall have the right, at its sole expense, to assert claims against Landlord on behalf of Sublessor to the extent of any breach or default by Landlord under the Master Lease and all damages and remedies paid or collected by Sublessee resulting therefrom shall belong solely to Sublessee.

21.    **Damage to Premises.** Sublessee shall give prompt written notice to Sublessor in the event of any damage to the leasehold improvements or fixtures that occurs in the Premises. Upon such notice, Sublessor or Landlord, as appropriate, shall promptly repair and restore the leasehold improvements or fixtures so damaged to a condition that is as close as is reasonably possible to the value, condition and character of such leasehold improvements or fixtures immediately prior to such damage pursuant to the terms of the Master Lease. Except for damage to the Premises resulting from a willful, intentional or negligent act of Sublessee, its guests or invitees, payment of the costs and expenses of any such repair and restoration shall be the responsibility of Landlord, as provided for in the Master Lease. If the payment of rent by Sublessor is suspended under the Master Lease, then the payment of rent by Sublessee under this Sublease shall be suspended for a similar period of time. Notwithstanding any provision of this Section 21 to the contrary, if during the term of this Sublease the Master Lease is terminated as a result of damage to or destruction of the Premises although Sublessor may not terminate the Mater Lease without approval in writing of Sublessee, which approval shall not be unreasonably withheld or delayed, and Sublessor must terminate the Master Lease if permitted and if requested in writing by Sublessee, then this Sublease may be terminated by either party upon written notice to the other party of such fact within fifteen (15) days of the termination of the Master Lease ; provided, however, although Sublessee is not obligated to do so, to the extent permitted by Sublessor under the Master Lease, Sublessee may elect to repair damages to the Premises or related building so that the Master Lease is not terminated.

22.    **Assignment; Subletting.** Sublessee may not sell, convey, set over, assign, or otherwise transfer this Lease, or any portion of Sublessee's interest in this Sublease, or sublet any portion of the Subleased Premises, whether voluntarily, involuntarily or by operation of law (hereinafter collectively referred to as "Transfer") without Sublessor's prior written consent, which shall not be unreasonably withheld or delayed. In assessing whether to give or withhold consent, Sublessor may take into account any relevant matters that in Sublessor's reasonable judgment might affect Sublessor's credit, business reputation or potential liability for the obligations of the lessee under the Master Lease or to third parties, including, without limitation, the creditworthiness and financial strength of the proposed transferee, the creditworthiness and financial strength of Sublessee, the nature of the transferee's business and its proposed use of the relevant portion of the Subleased Premises, and the business reputation of the proposed transferee. For the purposes of this Sublease, the term "Transfer" shall include, but not be limited to, any assignment or any attempted assignment of this Sublease or any rights herein, any total or partial transfer, sale, assignment, lease, sublease, franchise, license, gift, hypothecation, mortgage, pledge, encumbrance, or the entering into any agreement do to any of the foregoing. Any Transfer without Sublessor's prior written consent shall be void ab initio and shall be a material Event of Default under this Sublease. The approval of one Transfer shall not be deemed approval of or consent to any subsequent Transfer. Notwithstanding the foregoing, Sublessor hereby consents to the sublease of the Premises to Hoag Urgent Care Huntington Beach, Inc.,

11

P.C. Subtenant, a California professional corporation owned by Robert Amster, M.D. The parties acknowledge and agree that Hoag Urgent Care-Huntington Beach, Inc. has amended its articles of incorporation to change its corporate name to "Hoag Urgent Care-Huntington Harbour, Inc."

22.1 **Transfer Subject to Master Lease**. Any Transfer shall be subject to and governed by the terms of this Sublease and the Master Lease, and after any Transfer approved by Sublessor, Sublessee nonetheless shall remain liable for the full performance of all terms and conditions of this Sublease, including the payment of all Rent and other payments required hereunder.

22.2 **Change of Ownership or Control**. For the purpose of this Section 21, any single sale, assignment, transfer, or other disposition, or any series (whether or not related) of sales, assignments, transfers, or other dispositions during the term of this Sublease, of any of the issued and outstanding shares or ownership interests in Sublessee, if it results in changing the "ownership" or "control" of Sublessee, shall be construed as a Transfer of this Sublease. "Control" means possession, direct or indirect, of the power to elect or designate fifty-one percent (51%) or more of the governing board, or to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, as a general partner, by contract, or otherwise. "Ownership" means the possession, direct or indirect, of fifty one percent (51%) or more of the equity in Sublessee. Notwithstanding the preceding, however, the following Transfers shall not require the consent or approval of Sublessor: transfer of interests in Sublessor to employees of Sublessor and/or or to any family members or revocable trusts of any members or owners of Sublessor.

23. **Defaults and Remedies**.

23.1 **Sublessee Defaults**. The occurrence of any of the following events shall constitute a default hereunder by Sublessee:

23.1.1 The failure by Sublessee to make, when due, any payment of rent as required to be made by Sublessee hereunder, where such failure shall continue for a period of over ten (10) days after written notice thereof by Sublessor to Sublessee, except that if the failure is due to a breach by Hoag ("Lender") under that certain line of credit agreement described below, with respect to the advancement of loan proceeds which are budgeted for payments of rent herein or for any other permitted shortfalls, then such failure shall be excused until five (5) days after Lender has cured such breach.

23.1.2 The abandonment of the Premises by Sublessee. Abandonment is defined to include, but is not limited to, any absence of Sublessee or its sublessee or its representatives from the Premises for at least thirty (30) consecutive days, unless due to a casualty or other similar event that prevents Sublessee from operating the business at the Premises, in accordance with the terms of the Master Lease.

23.1.3 The failure by Sublessee to observe, perform or comply with any of the covenants, conditions or provisions of this Sublease (other than the payment of rent), where such failure shall continue for a period of at least thirty (30) days after written notice

12

thereof (together with reasonable detail as to the failure) by Sublessor to Sublessee, or such longer period as may be reasonably necessary to cure the default if the default cannot be reasonably cured within thirty (30) days, or such longer period to cure a non monetary default as provided for in the Master Lease.

23.1.4 The failure by Sublessee to observe, perform or comply with any of the covenants, conditions or provisions of that certain Line of Credit dated November 1, 2010, by and between Sublessor and Sublessee, where such failure shall continue for a period at least thirty (30) days after written notice thereof by Sublessor to Sublessee, Sublessor may, at its option, terminate this Sublease upon written notice to that effect to Sublessee, and the outstanding rent on this Sublease shall become due and payable within sixty (60) days thereof.

23.1.5 The bankruptcy or insolvency of Sublessee or any guarantor of Sublessee's obligations hereunder, or Sublessee or such a guarantor makes a general assignment for the benefit of creditors;

23.1.6 Commencement by Sublessee or any guarantor of Sublessee's obligations hereunder of any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property;

23.1.7 Commencement of any case, proceeding or other action against Sublessee or any guarantor of Sublessee's obligations hereunder seeking to have an order for relief entered against it as debtor, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and such case, proceeding or other action (i) results in the entry of an order for relief against it which is not fully stayed within seven (7) business days after entry thereof or (ii) remains undismissed for a period of sixty (60) days.

23.2 **Sublessor Covenants; Default**. Sublessor agrees to timely perform all of its obligations under the Master Lease, including, without limitation, the payment of all rent thereunder, and to terminate the Master Lease if requested in writing by Sublessee to the extent that events or facts exist that would permit the Sublessor to terminate the Master Lease; provided, however that so long as Sublessee is not then in default herein, Sublessor may not terminate the Master Lease without the written approval of Sublessee, which approval shall not be unreasonably withheld or delayed, notwithstanding any provisions in the Master Lease or herein to the contrary.

The failure by Sublessor to observe, perform or comply with any of the covenants, conditions or provisions of this Sublease where such failure shall continue for a period of at least thirty (30) days after written notice thereof by Sublessee to Sublessor, or such longer period as may be reasonably necessary to cure the default if the default cannot be reasonably cured within thirty (30) days or a default by Sublessor under the Master Lease which

13

LACA_2686613.5

060

is not cured within the cure periods specified in such Master Lease, unless solely due to a default by Sublessee herein, or a modification of the Master Lease without the written approval of Sublessee except as expressly provided for herein or except as to a permitted assignment of the Master Lease, shall constitute a default hereunder by Sublessor.

23.3    **Remedies**. In the event of a default by Sublessee as specified in Section 22.1 above, or in the event of a default by Sublessor as specified in Section 23.2 above, in addition to any other remedies available to either party at law or in equity, Sublessor or Sublessee, as the case may be, shall have the immediate option to terminate this Sublease upon a written notice to the other party to that effect. Upon the effective date of any termination, Sublessor shall repay to Sublessee any portion of the prior rent payment to covers any time period on or after the effective date of the termination of this Sublease.

23.4    **Attorney's Fees.** In the event of an Event of Default by Sublessee, Sublessee will be liable for and will pay Sublessor, in addition to the rents and other sums agreed to be paid hereunder, Sublessor's reasonable attorney's fees incurred in the enforcement of Sublessor's rights under this Sublease. In the event of any legal action or proceeding between Sublessor and Sublessee, arising out of or in connection with this Sublease, including trial and hearings, appeals and bankruptcy proceedings, the prevailing party shall be entitled to reasonable attorney's fees and court costs.

23.5    **No Personal Liability of Sublessor.** Except as provided for in the second sentence of this Section 23.5, the liability of Sublessor to Sublessee for any default by Sublessor under this Sublease shall be limited to the interest of Sublessor in the Premises and the Leased Assets, and Sublessee agrees to look solely to Sublessor's leasehold estate under the Master Lease, Sublessor's interest in the Leased Assets and Sublessor's right to receive Rents under this Sublease, for the recovery of any judgment from the Sublessor, it being intended that Sublessor shall not be personally liable for any judgment or deficiency. Notwithstanding the preceding sentence, Sublessor's shall also be liable for the following and such liability shall not be limited or subject to the preceding sentence: claims against Sublessor for damages arising out of the failure of Sublessor to renew the Master Lease with respect to any renewal options (unless Sublessee was in default herein at the time of such renewal ) or the failure of Sublessor to seek consent or approval of Landlord if such consent or approval may be sought under the Master Lease and provided such failure continues for five (5) days after written notice from Sublessee; Sublessor's acts or omissions that cause a termination of the Master Lease unless due to a default by Sublessee herein, claims to recover reasonable attorneys fees and costs incurred by Sublessee to enforce any provisions herein or in connection with any disputes herein to the extent Sublessee is entitled to such recovery of attorneys fees and costs; and claims arising out of any amendment or modification of the Master Lease that was not consented to in writing by Sublessee, and claims with respect to recovery of damages or relief from or against the Landlord, such as indemnification benefits, to the extent received by Sublessor and not paid over to Sublessee. No provisions in this Section 23.5 herein shall limit or affect the right of Sublessee to seek and recovery equitable relief against Sublessor, including, without limitation, specific performance.

23.6    **Adverse Impacts**. In the event that the performance by Sublessor or Sublessee of any term, covenant, condition, or provision of this Sublease or in connection with

14

LACA_2686613.5

061